## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:25-cv-02005

REGAN BENSON,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
HANS LEVENS, in his individual and official capacities,
JOEL BELL, in his individual and official capacities,
AARON SANCHEZ, in his individual and official capacities,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through her counsel, Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN | MCNULTY, hereby submits her Complaint and Jury Demand, and states as follows:

## INTRODUCTION

1. Plaintiff Regan Benson is a known critic of the Denver Police Department ("DPD"), its rampant misconduct, and its criminalization of homelessness. Because of her views on police misconduct, and lawsuits that have sought to hold DPD accountable for its misconduct, Ms. Benson has been barred from exercising her right as a citizen to participate in her local government.

2. Specifically, Ms. Benson sought to serve on the DPD Use of Force ("UOF") Review Board, which reviews DPD officers uses of force to ensure they align with DPD policy. According to DPD Chief Ron Thomas, the UOF Review Board has been plagued by a lack of

applicants for the past few years. Seeking to serve her community, Ms. Benson attempted to apply for a position on the UOF Review Board. Instead of being appreciative that Ms. Benson was willing to volunteer her time to serve, three high-ranking DPD officials (Commander Hans Levens, Commander Joel Bell, and Deputy Chief Aaron Sanchez) barred her from even applying to serve on the UOF Review Board because of her "history" with the DPD. The "history" they were referencing was Ms. Benson's longstanding outspoken criticism of DPD misconduct and successful lawsuits holding DPD accountable for its violation of her rights on multiple occasions. Because Ms. Benson is a critic of DPD, she was prevented from serving on the UOF Review Board. This censorship violated Ms. Benson's rights to free speech, associate with critics of DPD, and petition her government for redress of grievances under both the United States and Colorado Constitutions.

3.      This is not the first time that DPD officers have retaliated against Ms. Benson, and other individuals, for criticizing the DPD. In fact, DPD has a long, sordid history of violating critics' constitutional rights. Yet again, Ms. Benson is forced to vindicate her rights in federal court because the City and County of Denver habitually fails to police its police.

## JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

5.      Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

7.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## PARTIES

8.      At all times relevant to this Complaint, Plaintiff Regan Benson was a citizen of the United States of America and a resident of the State of Colorado.

9.      At all times relevant to this Amended Complaint, Defendant Denver was a Colorado municipal corporation.

10.      At all times relevant to this Complaint, Defendant Hans Levens was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Levens was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Levens is a peace officer employed by a political subdivision of the state required to be certified by the P.O.S.T. board and, therefore, is subject to suit under C.R.S. § 13-21-131.

11.      At all times relevant to this Complaint, Defendant Joel Bell was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Bell was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Bell is a peace officer employed by a political subdivision of the state required to be certified by the P.O.S.T. board and, therefore, is subject to suit under C.R.S. § 13-21-131.

12.     At all times relevant to this Complaint, Defendant Aaron Sanchez was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Sanchez was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Sanchez is a peace officer employed by a political subdivision of the state required to be certified by the P.O.S.T. board and, therefore, is subject to suit under C.R.S. § 13-21-131

## FACTUAL ALLEGATIONS

13.     Ms. Benson is a vocal advocate for homelessness rights in Denver. She runs her own nonprofit organization, Helping Hands for Dignity, that provides support for houseless individuals in South Denver. Ms. Benson helps houseless individuals in various ways and meets the people she serves where they are. She is consistently serving her community in South Denver by speaking with houseless individuals, ensuring that houseless individuals make important appointments, working with houseless individuals to obtain housing, helping houseless individuals clear warrants, and trying to get houseless individuals' possessions back when they are unlawfully seized by the DPD. Because of the DPD misconduct she has witnessed, Ms. Benson is a passionate advocate for not only the houseless, but also for police reform. She vocally advocates against homeless sweeps and the criminalization of poverty.

14.     In short, Ms. Benson is a well-known homelessness advocate. Ms. Benson has been repeatedly targeted by DPD officers, through arrests, harassment, and intimidation, because she regularly criticizes DPD officers and films them in the performance of their duties. Because of her advocacy, DPD officers know her by name, including Defendants.

15.     Ms. Benson is constantly doing what she can to hold DPD officers accountable. She often files complaints with the Office of Independent Monitor when she observes police

misconduct. Ms. Benson has filed multiple successful lawsuits against Denver and DPD officers for violating her constitutional rights. She is a vocal critic who routinely attends public meetings to highlight issues she has observed with policing in her city and neighborhood.

16.     In line with her penchant for holding DPD officers to account, Ms. Benson sought to join the DPD UOF Review Board. The UOF Review Board is a volunteer citizen board that reviews uses of force by DPD officers to ensure they are in line with DPD policy.

17.     Specifically, Ms. Benson was motivated to join the UOF Review Board by a news report by 9News in late 2024 where DPD Chief Ron Thomas was lamenting the lack of citizen participation in the process. In the article that Ms. Benson read about the lack of citizen participation on the UOF Review Board, the head of Denver's Citizen Oversight Board ("COB") at the time, Julia Richman, referenced a report by the COB finding that one of the participants on the UOF Review Board had been sitting on the UOF Review Board since 2013, despite the goal that the UOF Review Board consist of rotating citizens so that a diversity of viewpoints could weigh in and provide oversight. Because of the lack of oversight by the UOF Review Board, since 2018, there have only been two findings by the UOF Review Board that a police shooting was outside of policy despite the fact that there have been multiple high-profile settlements and verdicts finding that DPD officers violated individuals' rights by shooting them. Chief Thomas was quoted as saying in the article that interest in serving on the UOF Review Board by citizens is not exactly robust.

18.     Ms. Benson read this news report and decided that she should apply to the UOF Review Board so that she could participate in the process. She knew that this was a volunteer position that required a significant amount of work. As a citizen of Denver, Ms. Benson was

intent on doing her civic duty and ensuring that DPD officers faced true accountability through the UOF Review Board process.

19.    On January 25, 2025, Ms. Benson emailed the DPD Public Information Office ("PIO") to request information about joining the UOF Review Board:

> Hello-
>
> I would  like information on the process to be on the use of force board.
>
> Thank you.
>
> Regan M Benson
> Sent from my iPhone

20.    In response, an unnamed member of the DPD PIO emailed Ms. Benson and told her the process for joining the UOF Review Board (including that she would need to be nominated by either a Denver City Council member or DPD official):

Hello,

The policy regarding Use of Force Board Procedures is available in the <u>Operations Manual</u> Section 105.05.  Current policy is that two community members "selected and trained by the department" are voting members of the Use of Force Board.

City Council members and DPD personnel nominate names of individuals who are reliable, unbiased, and have a vested interest in serving the community through the Use of Force Board process.  The nominees will undergo a background check, participate in a ride-along with a DPD officer, and attend a <u>Community Academy</u>. After completing these steps, if the nominee is interested in joining the Use of Force Review Board, they will interview with representatives of the DPD, the Office of the Independent Monitor (OIM), and/or the COB for final selection.

1. Selected candidates will undergo training including a hands-on training on all forms of DPD's Less-Lethal alternatives, and instruction on The Crisis Intervention Team (CIT) Program and DPD Policies including Use of Force and Firearms
2. Selected candidates must be willing to participate in a minimum of two Board meetings per year (including 20 – 30+ hours of case review prior to each Board meeting) for a term of three years and sign a confidentiality declaration. Depending on the number of Board reviews that may be needed, and the number of community Board members available, actual participation may vary.

<image001.png>          Media Relations Unit
                         Denver Police Department | City and County of Denver
                         Phone: (720) 913-6028 | 24/7 Media: (720) 663-8203
          311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

21.    Ms. Benson responded by inquiring how exactly nominations happen:

Thank you for the information.

What is the more defined process of HOW cc members and DPD personnel make the nominations? I'm not finding that process in any policies or within city charter.

Regards
Regan M. Benson

"The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

22.    The unnamed member of the DPD PIO did not provide additional information, but referred Ms. Benson to Defendant DPD Commander Hans Levens:

Hello,

There is no other charter or policy related to selecting someone for the board. As previously stated in the email, City Council members and DPD personnel nominate names of individuals who are reliable, unbiased, and have a vested interest in serving the community through the Use of Force Board process. Once they complete the requirement to participate in a police ride along and attend a community academy, they will interview with representatives of the DPD, the Office of the Independent Monitor (OIM), and/or the COB for final selection. Any suggestions for nominees can be emailed to Commander Hans Levens(Hans.Levens@denvergov.org).

Thank you,

<image001.png>                    Media Relations Unit
                               Denver Police Department | City and County of Denver
                               Phone: (720) 913-6028 | 24/7 Media: (720) 663-8203

        311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

23.    Ms. Benson followed up by clarifying that, without a nomination, a citizen cannot serve on the UOF Review Board:

> Thank you.
>
> So if a person is not "nominated" by DPD and city council members, they cannot begin the process of completing the other requirements?
>
> Regan M Benson
> Sent from my iPhone

24.     The unnamed member of the DPD PIO confirmed that, without a nomination, a citizen cannot serve on the UOF Review Board:

> Correct. The first step would be the nomination. Then the other requirements would need to be completed.
>
> Thanks,
>
> <image001.png>          Media Relations Unit
>                         Denver Police Department | City and County of Denver
>                         Phone: (720) 913-6028 | 24/7 Media: (720) 663-8203
>
>          311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

25.     Ms. Benson, seeking to serve on the UOF Review Board, asked additional questions about how an individual can be nominated:

> What are the requirements for the nomination from DPD?
> How many members of cc are required for a nomination?
>
> Regan M Benson
> Sent from my iPhone

26.     When the unnamed member of the DPD PIO did not respond to Ms. Benson's email, she reached out to Defendant Levens to seek further clarification on the process to join the UOF Review Board:

Hello Commander Levens-

I've been asking some questions through the PIO, not sure who's been responding because they wont sign their name to any of the communications but they've stopped responding to my questions and since they referred to you last as the person that takes nominations for the use of force review board, can you please provide me with these answers that I need.

I've been told that to be part of the use of force board as a citizen, a nomination process must occur first and what I was told is not outlined in any DPD policy or charter language so I need to know:

1. How many city council members must nominate a person to you?
2. What is the DPD process for obtaining nominations? Does a person fill out a form? Ask you? Ask any DPD personnel for a recommendation? How does DPD personnel give and get a nomination to you, for a citizen requesting participation in the use of force review board?

Thank you.

Regards
Regan M. Benson

"The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

27.    Defendant Levens answered Ms. Benson's questions, then asked if she was inquiring because she wanted to serve on the UOF Review Board herself:

Regan,

There is no specific number of individuals that city council must nominate. If a city council member nominates an individual to go through the process to potentially sit on the UOF board then that city council person is putting their name behind that community member and is affirming that their nominee is reliable, unbiased, and has a vested interest in serving the community through the Use of Force Board process. DPD personnel (primarily command officers) may refer an individual with the belief that that person is reliable, unbiased, and has a vested interest in serving the community through the Use of Force Board process. Any potential nominations or community members that would be good candidates are then forwarded to me where I will establish communication with them and ask that they participate in a DPD ride-along to start. Community members must be residents of Denver. If a community member has an interest in participating in the UOF board, they can reach out to the Commander in the District in which they reside. I will vet any interested community members before deciding to proceed with a background check and potential interviews.

Are you inquiring for yourself?

Thanks,

<image001.png>                                **Hans Levens** | Commander

28.    Ms. Benson responded that she was, indeed, asking about the UOF Review Board process because she wished to join the UOF Review Board, and asked Defendant Levens an additional question about the process:

> I am inquiring for myself, yes. This is also the first time it's been mentioned a person must be a Denver resident. But understandable.
>
> So the city council /command staff nomination is a may not a must, process?
>
> Regan M Benson
> Sent from my iPhone

29.     In response, Defendant Levens told Ms. Benson that there was an exception to the nomination requirement, which was that Defendant Levens would assess those who might be interested in  joining the UOF Review Board, but had not been nominated, on a case-by-case basis:

> If an individual does not get nominated by CC or a Commander, they can reach out to me.  I will look at those persons who may be interested on a case-by-case basis.
>
> <image001.png>     **Hans Levens** | Commander
> Denver Police Department | Conduct Review Bureau
> City and County of Denver
> phone: (720) 913-6528
>         311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

30.     A few hours after receiving this information from Defendant Levens, Ms. Benson emailed Defendant DPD Commander Joel Bell to seek a nomination to join the UOF Review Board. Ms. Benson resides in DPD District Three, and Defendant Bell is the Commander for District Three. Ms. Benson asked Defendant Bell to nominate her to join the UOF Review Board:

Hello Commander Bell-

I am writing to you as a follow to process defined to me by Commander Levens.

While it is not defined in department policy or city charter, it is apparently considered part of an arbitrary process to receive a nomination to begin the process of serving on the use of force board for the Denver PD. I was told the nomination may be made the commander of the district I reside in. That is district 3.

I am asking that you nominate me to begin this process. The process defined to me, is to nominate me by emailing Commander Levens. I'm not sure what process you require to nominate me, but please advise.


Regards
Regan M. Benson

"The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

31.     Instead of responding to Ms. Benson's email, Defendant Bell called Defendant Levens. Defendant Bell and Defendant Levens jointly decided, and conspired, to reject Ms. Benson from joining the UOF Review Board because she has been a vocal critic of misconduct by the DPD. They decided that Ms. Benson would not even be allowed to apply for the UOF Review Board.

32.     Defendant Bell never responded to Ms. Benson's email requesting a nomination. Instead, a few hours after emailing Defendant Bell, Ms. Benson received an email from Defendant Levens informing her that she would not be considered for the UOF Review Board because of her "history with DPD":

> Regan,
>
> I was advised that you reached out to Commander Bell, seeking a recommendation from him to be considered for the UOF board. I apologize, I believed that you lived outside of Denver. Either way, you will not be considered because of your history with DPD.
>
> Thanks,
>
> \<image001.png\>    **Hans Levens** | Commander
> Denver Police Department | Conduct Review Bureau
> City and County of Denver
> phone: (720) 913-6528
> 311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

33.    Ms. Benson's "history with DPD" is that she is a longstanding critic of the department. Further, she has successfully sued DPD on multiple previous occasions for violating her rights. It was due to this measured, and valid, criticism of DPD that Defendant Levens and Defendant Bell barred her from even applying for the UOF Review Board.

34.    In response to Defendant Levens' email, Ms. Benson asked Defendant Levens for clarification what he meant by her "history" with DPD:

> Commander Levens- I answered your question earlier when you asked me if I was inquiring for myself.
> Odd series of responses.
>
> "My history"?
>
> What about "my history" disqualifies me to sit on a citizen panel?
>
> Regan M Benson
> Sent from my iPhone

> Commander Levens-
>
> Who do I appeal your decision to, since I'm not getting a response as to why my history with DPD disqualifies me to go through this process?
>
> Regan M Benson
> Sent from my iPhone

14

35.      In response, Defendant Levens doubled down and made it abundantly clear that Ms. Benson's history of criticism of the DPD was the reason for her being barred from joining the UOF Review Board:

Regan,

When I say, "because of your history with DPD", I'm referring to the fact that you are biased.  We are looking for community members that are impartial.  The Chief of Police is not available today, but you are welcome to email Division Chief Aaron Sanchez at aaron.sanchez@denvergov.org

Thanks,

<image001.png>                    **Hans Levens** | Commander
                                  Denver Police Department | Conduct Review Bureau
                                  City and County of Denver
                                  phone: (720) 913-6528

311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

36.      Ms. Benson appealed Defendant Levens' decision to bar her from even applying to serve on the UOF Review Board to Defendant DPD Division Chief Aaron Sanchez:

Chief Sanchez-

I am emailing you in response to Hans telling me that I cannot go through the process for the use of force board, citizen selection.
He states I have a history with DPD so that disqualifies me because according to him, I am biased.

So this communication is following his process after I asked him who I appeal his decision to.

I am asking to go through the process to serve in the citizen capacity on the use of force board.

Regards
Regan M. Benson

"The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

37.    Defendant Sanchez informed Ms. Benson that Defendant Levens was a final policymaker for Denver with respect to the UOF Review Board application and nomination process. Defendant Sanchez affirmed Defendant Levens' decision, which was based on Ms. Benson's criticism of DPD, and continued to bar her for even applying to serve on the UOF Review Board:

Hello Regan,

Thank you for your inquiry and interest in the Use of Force Review Board.  Based on our process, the decision of Commander Levens is final.  At this time, you will not be considered for the UFRB.  I do appreciate your follow up.

Thank you,



Aaron Sanchez | Division Chief of Patrol
Denver Police Department | City and County of Denver
720-913-6527 Main |
aaron.sanchezt@denvergov.org

38.    To this day, Ms. Benson remains barred from even applying to serve on the UOF Review Board because she is a critic of DPD misconduct.

39.    Defendants' decision to bar Ms. Benson from even applying to the UOF Review Board was a viewpoint-based restriction on her speech, petitioning, and association. Had Ms. Benson been perceived by Defendants as an enthusiastic supporter of the DPD then they would have nominated her for the UOF Review Board. Had Ms. Benson never sued DPD officers for violating her rights then she would have been nominated to serve on the UOF Review Board. It was only because of Ms. Benson's viewpoint about DPD misconduct that she was barred from applying to join the UOF Review Board.

16

40.     This viewpoint-based restriction by Defendants violated Ms. Benson's free speech, petitioning, and association rights under both the United States and Colorado Constitutions.

**Pursuant to its custom and practice, Defendant Denver abjectly failed to discipline Defendants Levens, Bell, and Sanchez for their unconstitutional conduct.**

41.     After being barred from applying to the UOF Review Board, Ms. Benson filed a complaint with DPD Internal Affairs and the Office of Independent Monitor. DPD concluded that Defendants Levens, Bell, and Sanchez did not violate Denver policy in their decision to bar Ms. Benson from serving on the UOF Review Board.

42.     Defendant Denver has imposed no discipline on Defendants Levens, Bell, and Sanchez for their unconstitutional actions against Ms. Benson. Defendant Denver, through its actions and inaction, has condoned the conduct of Defendants Levens, Bell, and Sanchez.

43.     Based on Denver's custom and practice of tolerating and ratifying such unconstitutional conduct, Defendants Levens, Bell, and Sanchez knew prior to violating Ms. Benson's constitutional rights that they would not be disciplined by Defendant Denver for their actions.

44.     Through its failure to supervise and discipline Defendants Levens, Bell, and Sanchez, Defendant Denver ratified their unconstitutional actions.

45.     This was not the first time that Defendant Denver condoned its officers' unconstitutional retaliation and violation of free speech, association, and petitioning rights.

46.     It was also not the first time that Defendant Denver condoned its officers' unconstitutional retaliation against individuals who criticize police officers.

**Defendant Denver is liable for its officers' violations of Ms. Benson's rights pursuant to its multiple unconstitutional customs and practices.**

47.    All of the acts described herein were done by the Individual Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Benson's federally protected rights and were done pursuant to the preexisting and ongoing deliberately indifferent custom and practice of Defendant Denver.

48.    The Individual Defendants' treatment of Ms. Benson was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to:

    a.  Retaliating against individuals for engaging in speech activity that is critical of DPD officers;

    b.  Failing to discipline officers, or even find officers have engaged in wrongdoing, in the face of obvious unconstitutional actions.

**Defendant Denver failed to adequately supervise its officers.**

49.    Upon information and belief, Defendant Denver has provided no additional training to Defendants Levens, Bell, and Sanchez related to the incident with Ms. Benson.

50.    Defendant Denver failed to properly train and/or supervise its employees to avoid inhibiting free speech, petitioning, and association.

51.    Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

52.    The other incidents outlined below illustrate an obvious need, of which Defendant Denver was aware at the time of the violation of Ms. Benson's constitutional rights, for Defendant Denver to provide further supervision to its officers on the necessity of not retaliating against individuals who criticize police officers.

**Defendant Denver has a custom and practice of retaliating against Ms. Benson because of her speech that is critical of the DPD, its officers, and their misconduct.**

**Ms. Benson is barred from attending public meetings because of her criticism of the DPD.**

18

53.     Ms. Benson's ban from the UOF Review Board is not the first time she has been retaliated against for her criticism of the DPD or banned from participating in a process by DPD because of her viewpoint. In 2021, Ms. Benson was retaliated against by Denver officials, including both DPD officers and a Denver City Attorney, because she spoke out at a public meeting about DPD misconduct; Ms. Benson was banned from attending public meetings simply because she was critical of the DPD.

54.     During the COVID-19 pandemic, Ms. Benson began attending DPD Citizen's Advisory Board (CAB) meetings. CAB meetings are designed by DPD to inform the community and gather their input on DPD priorities. During CAB meetings, DPD command staff from each District provide statistics for the entire district. The CAB meetings are also specifically designed to allow community members to ask command staff any question they would like. The CAB meetings are open to the public without restriction. DPD advertises the CAB meetings as a great opportunity for community members to meet  DPD officers while being able to ask them questions.

55.     DPD's District Four holds its CAB meetings on the second Wednesday of each month. During the COVID-19 pandemic, these meetings were held virtually on the Microsoft Teams platform. Denver City Councilmember Kevin Flynn regularly attended these meetings.

56.     Ms. Benson attended the virtual District Four CAB meetings in July and August of 2021. During those meetings, Ms. Benson listened respectfully to DPD command staff talk about their activities in the neighborhood where she advocated on behalf of the houseless. Ms. Benson heard the command staff give a far different account of how DPD officers were policing houseless individuals than she had observed. Based on Ms. Benson's observations and her clients' experiences, DPD officers routinely illegally seized and discarded houseless individuals'

property, bullied them with threats of enforcement of Denver's camping ban, entered their tents without a warrant, and initiated the towing of the recreation vehicles that they used as homes without the proper process or authority. Despite this, Ms. Benson sat quietly and did not speak during either of these meetings. She did, however, participate in the virtual text-based chat without incident.

57.    On September 8, 2021, Ms. Benson again attended the virtual District Four CAB meeting. Prior to the meeting, she announced on her YouTube channel, which she uses to spread the message about the work of her nonprofit and to highlight the treatment of houseless individuals in Denver, that she would be attending the virtual meeting. Ms. Benson indicated in that video that she was critical of the DPD response to homelessness and, if prompted during the meeting, would likely share her factual criticisms.

58.    The meeting District Four CAB on September 8, 2021, was very informal. DPD officers gave presentations on various topics. City Councilmember Flynn was in attendance as were Chief Thomas and Commander Mark Fleecs. Commander Fleecs regularly attends District Four CAB meetings, but Ms. Benson was surprised to see Chief Thomas in attendance. Chief Thomas had not attended any of the prior virtual meetings.

59.    During the meeting, many members of the community interjected to ask questions and make comments. One person asked questions and spoke about crime statistics. Another person made comments about being tired of seeing guns on the streets. These community members did not raise their hands and, instead, simply spoke up with their questions and comments. DPD command staff, including Chief Thomas and Commander Fleecs, listened to these individuals and never took any action to ban them from future meetings.

60.     At the end of the meeting, DPD command staff took questions from the audience on any topic that the audience member wanted to discuss. Ms. Benson clicked the button to virtually raise her hand during this portion of the meeting and waited to be called on.

61.     DPD command staff called on Ms. Benson and she began to speak. Ms. Benson's comments focused on how Denver's response to homelessness has been a failure. She spoke about how, in particular, DPD's District Four was focused on criminalizing houseless individuals rather than providing resources. Ms. Benson spoke about her experiences serving homeless encampments and that she regularly witnessed the seizure and destruction of houseless individuals' property, which she considered cruel and unhelpful to the mission of ending homelessness. Ms. Benson passionately advocated but did not yell or use profanity. Other community members also engaged in the discussion that Ms. Benson had sparked, and Ms. Benson felt as though an important dialogue was had about how Denver and the DPD treats houseless residents.

62.     Chief Thomas seemed to take umbrage at Ms. Benson's comments and began directly challenging her. Ms. Benson calmly answered Chief Thomas' questions. It was Ms. Benson's observation that Chief Thomas did not know what was going on with District Four's response to homelessness because he had not been attending the encampment sweeps in the district, and she told him as much. Ms. Benson felt as though the discussion with Chief Thomas was civil and important. She appreciated the opportunity to directly speak with DPD command staff about the issues that she was seeing every day as an advocate for houseless individuals.

63.     On October 13, 2021, Ms. Benson attempted to attend the virtual District Four CAB meeting. When Ms. Benson attempted to enter the virtual meeting, she was denied entry by Commander Fleecs.

64.    The next day, Ms. Benson emailed Commander Fleecs and asked him why she had been banned from the meeting. Commander Fleecs told Ms. Benson that she was banned because she began a debate regarding homeless encampments and police involvement (including using the terms "sweeps" to describe police action relating to encampments) during the meeting on September 8, 2021. Commander Fleecs wrongly labeled Ms. Benson's comments, which were merely critical of the DPD responses to homelessness, as disrespectful and inappropriate. Commander Fleecs then informed Ms. Benson that she was banned from participation in all future CAB meetings.

65.    Ms. Benson sent Commander Fleecs a follow-up email asking him to reconsider and telling him that banning her from continuing to attend meetings violated her free speech rights. Commander Fleecs responded in a cursory and curt email that Ms. Benson would continue to be banned from attending CAB meetings.

66.    Ms. Benson was banned from attending CAB meetings because of her viewpoint. If Ms. Benson had been praising the DPD response to homelessness, she would not have been banned from attending CAB meetings.

67.    Commander Fleecs and Chief Thomas conspired together, and with Denver City Attorney Kristen George and other lower-ranking DPD officers, to ban her from future meetings because she spoke out against DPD's current approach to homelessness. Chief Thomas' tenor during the meeting made clear to her that he was upset by her comments and Commander Fleecs' email told Ms. Benson that he would not allow criticism of the DPD at CAB meetings.

68.    After Ms. Benson was barred from the meeting, DPD began surveilling her. They sent out an email with a picture of her and her car and told officers to specifically watch out for

her. Ms. Benson has never engaged in any violent actions toward police officers, or anyone else, that would justify having the police put out a bulletin about her or surveil her.

69.    Ms. Benson filed suit against DPD for violating her constitutional rights under both the United States and Colorado constitutions and Denver settled Ms. Benson's claims. The settlement included a significant monetary payment and agreement that the ban on Ms. Benson attending CAB meetings would be lifted.

**DPD officers retaliate against Ms. Benson and her husband because of Ms. Benson's criticism of the police.**

70.    Earlier in 2021, DPD officers again retaliated against Ms. Benson because she was criticizing DPD officers.

71.    On August 22, 2021, Mr. and Ms. Benson were driving near the 800 block of South Huron in Denver, Colorado. Mr. and Ms. Benson observed three DPD officers who were parked on private property. Both Mr. Benson and Ms. Benson made the affirmative decision to pull over to the side of the road, and stop, so that Ms. Benson could film the officers. Mr. Benson stopped his truck on the side of the road. While Mr. Benson stopped his truck, Ms. Benson pulled out her phone to begin recording the officers and did, in fact, start filming the officers.

72.    DPD Officer John Schaal noticed that Ms. Benson was recording, drove his vehicle up to Mr. Benson's truck, and asked if everything was ok. Ms. Benson responded that she was just checking to see if everything was ok for the officers. Officer Schaal rudely interrupted Ms. Benson and snidely told her to have a good day while aggressively pulling away. Officer Schaal knew who Ms. Benson was from the moment he drove up to Mr. Benson's vehicle and saw her filming the officers. Officer Schaal associated Mr. Benson as being Ms. Benson's husband and a supporter of her criticism of the DPD and critic of the homeless sweeps.

Mr. Benson's association informed all of his, and Officers Currier's and Allen's, decisions on August 22, 2021.

73.    Officer Schaal then pulled back alongside the other officers on the private property. Upon information and belief, Officer Schaal told the other officers that Ms. Benson and her husband were filming them. Officers Schaal, Currier, and Allen began conspiring to try to find a reason to retaliate against Mr. and Ms. Benson. Officers Schaal, Currier, and Allen decided that falsely accusing Mr. Benson of being parked illegally and blocking the roadway was the pretext that they would use to issue Mr. Benson a citation in retaliation for his wife's protected First Amendment activity. Officers Schaal, Currier, and Allen knew who Ms. Benson was. They saw Mr. Benson with Ms. Benson and retaliated against him based on his association with Ms. Benson's filming and her advocacy against homeless sweeps.

74.    After two minutes, Officer Schaal stepped out of his vehicle and approached Mr. Benson's vehicle. Immediately, Officer Schaal asked Mr. Benson if there was a reason he was in the middle of the roadway and blocking traffic, despite it being obvious to Officer Schaal that Mr. Benson was not in the middle of the roadway nor blocking traffic but was instead pulled off to the side of the road. Mr. Benson began to criticize Officer Schaal and informed him that he was not blocking the street. After Mr. Benson's criticism, Officer Schaal became more determined to retaliate against Mr. and Ms. Benson.

75.    Officer Schaal then told Officers Currier and Allen that he would be instituting a traffic stop and giving Mr. Benson a citation. Officers Currier and Allen approached Mr. Benson's vehicle and stood guard as Officer Schaal interacted with Mr. and Ms. Benson. Throughout the interaction, Officers Currier and Allen maintained a command presence

surrounding Mr. Benson's vehicle and made it clear to Mr. and Ms. Benson that they were not free to leave.

76.    Officer Schaal took down Mr. Benson's license plate and returned to his vehicle. Once Officer Schaal returned to his vehicle, he aggressively whipped it around, pulled an illegal U-turn across the roadway, and parked immediately behind Mr. Benson's truck.

77.    After parking behind Mr. Benson's truck, Officer Schaal approached Mr. Benson and again told him that he was illegally blocking the roadway (which was not true). Mr. Benson was again critical of Officer Schaal and told him that he was not blocking the roadway. Mr. Benson's criticism irritated Officer Schaal and Officer Schaal asked for Mr. Benson's identification, insurance, and registration. Mr. Benson provided all of these things to Officer Schaal. Officer Schaal proceeded to write Mr. Benson a citation for allegedly violating D.R.M.C. 54-160 in retaliation for Mr. Benson's criticism and association with his wife. The citation carried with it a $135 fine and Mr. Benson was assessed three points on his driver's license.

78.    While Officer Schaal was taking all of the above-described actions, Defendants Currier and Allen stood by and did nothing to intervene. Officers Schaal, Currier, and Allen detained Mr. and Ms. Benson for approximately twenty minutes and then jointly took action to cite Mr. Benson. All of the officers conspired together to violate the rights of Mr. and Ms. Benson.

79.    After giving Mr. Benson a citation, the officers left the scene. When they left the scene, they did not make Mr. Benson move his vehicle. Given that they allowed Mr. Benson's vehicle to remain in the roadway, it was clear that his vehicle was not blocking the roadway and that their citation was just a pretextual reason for their retaliation against Mr. and Ms. Benson.

80.     Later, in retaliation, Officer Schaal submitted a formal request for re-examination to the Colorado DMV, which he knew would require that Mr. Benson would have to re-take his driver's examination to retain his license. Officer Schaal purposefully did this without telling Mr. Benson and never told Mr. Benson that he took this action. Officer Schaal took this action solely because Mr. and Ms. Benson's First Amendment activity as outlined above.

81.     Officer Schaal submitted the formal request for re-examination to the Colorado DMV at the urging of his supervisor Sergeant James Peloni. Officer Schaal specifically sought out Sergeant Peloni to receive cover for his retaliatory desire to submit the formal request for re-examination to the Colorado DMV. Officer Schaal described to Sergeant Peloni the actions of Mr. and Ms. Benson. In response, Sergeant Peloni encouraged Officer Schaal to submit the formal request for re-examination to the Colorado DMV. Sergeant Peloni told Officer Schaal that he submits formal requests for re-examination to the Colorado DMV all the time and that driving is a privilege that can be taken away by the police. Sergeant Peloni routinely used the formal request for re-examination to the Colorado DMV as a tool to retaliate against individuals who were critical of the police. Officer Schaal and Sergeant Peloni, jointly, decided to submit the formal request for re-examination to the Colorado DMV to retaliate against Mr. and Ms. Benson.

82.     A few months later, on November 17, 2021, Mr. Benson appeared in Denver County Court to contest his ticket. Officer Schaal appeared in support of the ticket. During the hearing both Mr. Benson and Officer Schaal testified, and Denver County Magistrate Judge Catherine Cary presided.

83.     After both parties testified, Judge Cary ruled from the bench. She made a finding that Officer Schaal used the municipal ordinance as a pretext to retaliate against Mr. and Ms. Benson. The judge also found that there was no basis for the charges.

26

84.     The judge went on to find that Mr. Benson was not guilty of impeding traffic in violation of D.R.M.C. 54-160.

85.     Almost one month later, Mr. Benson was driving on Interstate 70 westbound through Idaho Springs. A state trooper pulled him over for allegedly speeding (this ticket was ultimately dismissed by a Clear Creek County judge in February of 2022). The state trooper that pulled Mr. Benson over informed him that his license had been suspended because of the re-test requirement placed on his license by Officer Schaal. Mr. Benson was given a ticket not only for speeding, but also for driving under suspension. The state trooper destroyed Mr. Benson's license and Mr. Benson was required to go to the Department of Motor Vehicles to get a new license.

86.     Mr. Benson's ticket for driving under suspension was dismissed after he provided the Clear Creek County Court with a certified copy of his driving record along with his driver's license (which he had to get reinstated). As a result, Mr. Benson lost approximately three days of work.

87.     Ms. Benson filed suit against DPD for violating her constitutional rights under both the United States and Colorado constitutions and Denver settled Ms. Benson's claims. The settlement included a significant monetary payment and agreement that individuals would be allowed to record within DPD stations going forward.

**Denver has an informal custom or practice of condoning acts of retaliation by its officers that is based solely on the exercise of free speech, association, and petitioning rights.**

88.     Denver has a history of retaliating against individuals who are critical of police officers—an issue that should have long since been addressed by Denver. A number of previous, similar incidents demonstrate that, at the time of the incident involving Ms. Benson, there was a

formal or informal custom and practice, that was known to Denver, of retaliating against individuals who record police officers, and of condoning this retaliation. The following analogous incidents show that this informal custom and practice was widespread, and that Denver has consciously decided to stop this informal custom and practice from existing within the DPD.

89.    Defendant Denver has a longstanding pattern of ratifying its officers' unconstitutional retaliation, through arrests and malicious prosecutions, against individuals who record officers in the performance of her duties and criticize police officers, as detailed below. Because of this longstanding pattern, Defendants Levens, Bell, and Sanchez in this case knew that they could unconstitutionally retaliate against Ms. Benson  and they would not face any discipline or other consequences from Defendant Denver. This custom and practice of ratifying unconstitutional retaliation was known by Defendants Levens, Bell, and Sanchez before they retaliated against Ms. Benson, and caused them to retaliate against Ms. Benson without fear that they would be disciplined by Defendant Denver.

90.    Through its continuous ratification of unconstitutional retaliation against individuals who criticize police officers, Defendant Denver has condoned and ratified the conduct of Defendants Levens, Bell, and Sanchez.

91.    All of the acts described herein were done by Defendants were intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Benson's federally protected rights and were done pursuant to the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Denver acting under color of state law.

92.     Defendants Levens, Bell, and Sanchez's treatment of Ms. Benson was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to retaliating against individuals who criticize police officers. These widespread customs and practices have borne out over the years in repeated retaliation by Denver officers against individuals who criticize the police with no disciplinary action. This has led to Defendant Denver sending a clear and unequivocal message to its officers that retaliation against those who criticize the police is acceptable and tolerated by Defendant Denver.

93.     The following are examples of Denver police officers violating individuals' rights without repercussion, and of Denver officers engaging in this unconstitutional conduct pursuant to the customs and practices of Defendant Denver.

94.     On September 23, 2018, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the property, and instead, officers arrested her in retaliation for engaging in First Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Ms. Sodaro's arrest was unconstitutional and in retaliation for her engaging in First Amendment protected activity. The officers who unconstitutionally arrested Ms. Sodaro then instituted baseless charges against her to cover-up her unconstitutional retaliation and to punish her for speaking out. Ms. Sodaro spent time in jail because of the DPD officers' actions. Denver never disciplined the officers for her unconstitutional actions.

95.     On September 23, 2018, Brian Loma and Mikel Whitney were protesting the police in downtown Denver. During his protest, Mr. Loma shouted, "fuck the police!" Upon

hearing these words, DPD officers began contemplating whether Mr. Loma should be arrested for disturbing the peace. When Mr. Loma's shouting and profanity annoyed the sensibilities of a couple dining on a nearby restaurant patio that protrudes onto the public sidewalk, Denver officers used the couples' complaint to, within minutes, arrest and jail Mr. Loma for his protected speech. Mr. Whitney observed Mr. Loma's protest and subsequent arrest. As a concerned citizen and friend of Mr. Loma's, Mr. Whitney took photos of the incident, believing the officers were committing illegal acts in retaliation against Mr. Loma for his protected speech. In his effort to gather information about the officers' misconduct, Mr. Whitney unsuccessfully attempted to take a photo of the complaining couple and her surroundings while standing on a public sidewalk from several yards away. This upset a few Denver officers, who demanded Mr. Whitney not take pictures. Mr. Whitney calmly stated that he did not take a picture and that he was walking away. One officer retorted that Mr. Whitney was indeed going to walk away because the couple was ready to sign a complaint against him as well. As Mr. Whitney walked away, he stated, "I did not take a fucking picture." Upon hearing Mr. Whitney's statement, two of the Denver officers immediately arrested Mr. Whitney. While arresting him, Defendant Guzman told him to quit swearing. Denver officers unconstitutionally retaliated against Mr. Loma and Mr. Whitney because they were criticizing the police and, Mr. Whitney, because he was taking photographs of them in the performance of her duties. The officers proceeded to unlawfully search Mr. Whitney and Mr. Loma. The officers then instituted a baseless and malicious prosecution of both Mr. Whitney and Mr. Loma to cover-up her unconstitutional actions and to punish them for speaking out. Mr. Whitney and Mr. Loma spent a night in jail because of the unconstitutional actions of the DPD officers. Those charges were dropped by the prosecutor's office because they had no merit. Denver never disciplined the officers for her

unconstitutional actions. Mr. Whitney and Mr. Loma filed a federal lawsuit, and they settled her claims against Denver for $128,000.

96.    On September 24, 2018, Eric Brandt was in the Sixteenth Street Mall protesting her arrests. Mr. Brandt stood on a public sidewalk and shouted, "we want justice for Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!" Multiple Denver officers were present and closely watching Mr. Brandt. One officer expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." A woman standing nearby stated that she was offended and would sign a complaint. The officers then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018, because they had no merit and were merely instituted against him to cover-up her retaliatory actions and to punish him for speaking out. Mr. Brandt's arrest was clearly unconstitutional and undertaken in retaliation for him criticizing the police. Denver never disciplined the officers for her unconstitutional actions. Mr. Brandt filed a federal lawsuit, and Mr. Brandt settled his claims against Denver for $65,000.

97.    On July 15, 2019, multiple DPD officers violated the First Amendment rights of Natalie Kantor by retaliating against her for criticizing them in the public performance of her duties. Ms. Kantor was in a car that was pulled over by DPD officers on suspicion that the driver was driving under the influence. DPD officers performed a field sobriety test of the driver then, without warning, attempted to arrest the driver. The officers took him to the ground. When they did, Ms. Kantor exited the car to see what was happening. She then stood on a public sidewalk and criticized the officers' actions. For that, DPD officers arrested her. The officers then

instituted bogus charges against Ms. Kantor to further retaliate against her and to cover-up her unconstitutional conduct. Ms. Kantor spent a night in jail because of the DPD officers' unconstitutional actions. A jury found Ms. Kantor not guilty of those charges. Despite this, no DPD officer was disciplined for her unconstitutional actions toward Ms. Kantor. Ms. Kantor filed a federal lawsuit and Denver paid $100,000 to settle Ms. Kantor's claims.

98.     On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiff protested in Denver to express her outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the Plaintiff's First Amendment right to free speech and her Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the Plaintiff for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the Plaintiff's First and Fourth Amendment rights and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kinds against persons engaging in peaceful protest. Denver never disciplined the officers for her unconstitutional actions.

99.     On May 28, 2020, Michael Acker, a young black college student, was peacefully protesting in a march that was criticizing DPD officers. At one point during the protest, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents

unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a Kinetic Impact Projectile ("KIP") at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. None of the officers involved were disciplined for her unconstitutional actions. Mr. Acker filed a federal lawsuit and Denver paid Mr. Acker $500,000 to settle his claims.

100.    On May 28, 2020, while he was covering the protests rally at the State Capitol. Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel under the control of the DPD while he was photographing police conduct. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me." None of the officers involved were disciplined for her unconstitutional actions.

101.    On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP while he was at a protest criticizing DPD officers. Mr. Thorn is a veteran who served in the United States Armed Forces. Several times while Mr. Thorn was attempted to assist other injured people, DPD officers targeted him and shot pepper balls. While at the protest, Mr. Thorn observed a largely peaceful protest but saw DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. During the protest,

Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time. None of the officers involved were disciplined for her unconstitutional actions.

102.    On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was recording them, shot him in the chest with a pepper ball. None of the officers involved were disciplined for her unconstitutional actions.

103.    On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol criticizing DPD officers. When DPD officers shot her in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance. None of the officers involved were disciplined for her unconstitutional actions. Ms. Matthews filed a federal lawsuit and Denver paid Ms. Matthews $575,000 to settle her claims.

104.    On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7 was struck four times in the chest by KIPs fired by DPD officers while

the cameraman was recording police conduct. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level. None of the officers involved were disciplined for her unconstitutional actions.

105.    On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round by DPD officers while standing beside a professional cameraman from that station who was recording police conduct. The round struck Mr. Jojola's backpack. None of the officers involved were disciplined for her unconstitutional actions.

106.    On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer, was standing in a group of press photographers recording police conduct when a DPD officer kicked a pepper gas canister directly into her face. None of the officers involved were disciplined for her unconstitutional actions.

107.    On May 30, 2020, DPD officers shot Michael McDaniel in the head with pepper balls without warning while he attended a protest rally criticizing DPD officers. Mr. McDonald was simply peacefully attending the protest when he was shot without warning. None of the officers involved were disciplined for her unconstitutional actions.

108.    On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a pepper ball without warning while she was attending a protest that criticizing DPD officers. DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face. None of the officers involved were disciplined for her unconstitutional actions. Ms. Epps was awarded $1,000,000 by a jury of her peers for the DPD officers' violation of her First and Fourth Amendment rights.

109.    On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a rubber bullet without warning because they perceived he was attending a protest that was criticizing DPD officers. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. His friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. None of the officers involved were disciplined for her unconstitutional actions.

110.    On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a pepper ball without warning while he was attending a protest criticizing DPD officers. After being shot, he was taken to the emergency room. None of the officers involved were disciplined for her unconstitutional actions.

111.    On May 30, 2020, DPD officers without warning shot Russell Strong in the head with a baton round. Mr. Strong was protesting DPD officers near Civic Center Park and carrying a sign that read "No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a baton round. The force of the baton round knocked him out. As a result of this use of force, Mr. Strong required several facial reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot, Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction. None of the officers involved were disciplined for her unconstitutional actions. Mr. Strong filed a federal lawsuit and Denver paid $550,000 to settle Mr. Strong's claims.

112.    On May 30, 2020, Mercii Thomas was shot in the head with a rubber bullet by DPD officers without warning while she attended a protest criticizing DPD officers. Ms. Thomas joined the peaceful protests that had been happening in Denver since the video of the brutal police murder of George Floyd had been released a few days earlier. As Ms. Thomas was protesting, she looked around her and was horrified to see the police firing pepper balls and rubber at protesters who were lying on the ground. She began filming the police violence against peaceful protesters with her phone. As she did so, she observed other people who were recording with her phones being targeted with rubber bullets and pepper balls. It occurred to her that filming the police could be making her a target too. Suddenly, Ms. Thomas felt a massive blow to her forehead. Everything went black as she fell to the ground and lost consciousness. As she regained consciousness, she found herself being picked up and taken to a curb by medics. She lay on the ground bleeding profusely from her head while the medics worked on applying a tourniquet. Then she felt a sudden burst of pain on her lower back side and realized she had been hit by police again, this time with a pepper ball. Ms. Thomas was terrified, bleeding on the ground, and still police were targeting her with projectiles. She eventually received medical care for her injuries. None of the officers involved were disciplined for her unconstitutional actions. Ms. Thomas filed a federal lawsuit and Denver paid $500,000 to settle Ms. Thomas' claims.

113.    On May 30, 2020, DPD officers shot Darrell Hampton in the face with a pepper ball without warning. Mr. Hampton was peacefully protesting DPD officers on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming

the protest and the officers. None of the officers involved were disciplined for her unconstitutional actions. Mr. Hampton filed a federal lawsuit and Denver paid $175,000 to settle Mr. Hampton's claims.

114.    On May 31, 2020, Gabe Schlough was shot in the face with a rubber bullet by DPD officers without warning while he was attending a protest criticizing DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. Officers were standing just a little bit more than shoulder to shoulder apart with full riot gear, with her face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch her eyes and protect her face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with rubber bullets. Mr. Slough described the sensation as getting hit with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The rubber bullet had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required twenty-two stitches to close the wound on his chin. He still experiences pain from this wound and required plastic surgery for it to heal properly. None of the officers involved were disciplined for her unconstitutional actions. Mr. Schlough filed a federal lawsuit and Denver paid $575,000 to settle Mr. Schlough's claims.

115.    On May 31, 2020, while attending a protest criticizing DPD officers, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on

two perpendicular streets and began closing in on the groups of protesters. DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile shot by DPD officers. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. None of the officers involved were disciplined for her unconstitutional actions. Mr. Packard filed a federal lawsuit and jury awarded Mr. Packard $3,500,000 while finding that Denver officers violated his First and Fourth Amendment rights.

116.    On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with pepper balls without warning while he attended a protest criticizing DPD officers. Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with her hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with her hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with her hands up. The DPD and/or APD officers shot them approximately fourteen times. The DPD officers did not give any orders

before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at her feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree. None of the officers involved were disciplined for her unconstitutional actions. Mx. Amghar filed a federal lawsuit and Denver paid $250,000 to settle Mx. Amghar's claims.

117.    On May 31, 2020, DPD officers shot Darian Tindall in the chest with pepper balls without warning while attending a protest criticizing DPD officers. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD. None of the officers involved were disciplined for her unconstitutional actions.

118.    On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning while Mr. Cruz was attending a protest criticizing DPD officers. As a photographer and freelance journalist, Mr. Cruz documented the protests as well as the police response. As he was doing so, one DPD officer shot Mr. Cruz in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have

happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight. None of the officers involved were disciplined for her unconstitutional actions.

119.    On June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Broadcasters Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected to the use of force by DPD officers while filming police conduct in Denver. DPD officers hit these reporters and with pepper balls, projectiles, or tear gas simply for being present at protests that were criticizing DPD officers and documenting (through filming and photography) her brutal actions.

120.    On June 4, 2020, four persons who participated in the George Floyd protests in Denver sued Denver, alleging that DPD officers' actions violated the First and Fourth Amendments. After a hearing on the matter, Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order. In doing so, Judge Jackson reminded the DPD that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters who criticized them, calling it "disgusting." Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely

on the basis of her presence at the demonstrations, her viewpoint, or her attempts to render treatment to injured protesters." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

121.    In the early morning hours of June 12, 2022, DPD officers arrested Zachary Manchas simply because he protested the arrest of a person of color from a public sidewalk in downtown Denver, Colorado. After unconstitutionally arresting Mr. Manchas, the DPD officers conspired to prosecute him to further retaliate against him and to cover-up her unlawful arrest of him. Mr. Manchas spent a night in jail because of the DPD officers unconstitutional actions. The charges against Mr. Manchas were ultimately dismissed because they lacked merit. Denver took no action to investigate or discipline the officers that unconstitutionally arrested and initiated the prosecution of Mr. Manchas in retaliation for his exercise of his First Amendment rights.

122.    Almost every one of these representative cases resulted in Defendant Denver paying to significant sums to settle the claims against it for free speech violations, retaliation, and malicious prosecution, yet Defendant Denver failed to discipline its officers for violating the rights of those who criticize them. The facts surrounding Ms. Benson's case make apparent that Defendant Denver continues to condone such behavior by its police officers. This custom and practice caused the violation of Ms. Benson's constitutional rights, and Defendant Denver was on notice of this custom and practice based on these past incidents and others, which resulted in litigation and significant payouts by Defendant Denver at taxpayer expense.

**<u>Defendant Denver's unconstitutional customs and practices caused the violation of Mr. and Ms. Benson's constitutional rights.</u>**

123.    Defendants' unlawful conduct, as set forth in detail herein, was in accordance with the above-described customs and practices condoned and ratified by Defendant Denver that

were, even if not authorized by written law or express municipal policy, so permanent and well established as to constitute a custom or usage with the force of law.

124.    Defendant Denver's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of her violation of Ms. Benson's constitutional rights.

125.    Defendant Denver's policies, customs, or practices in failing to properly train and/or supervise its employees were the moving force and proximate cause of the violation to Ms. Benson's constitutional rights.

126.    The customs, policies, and practices of Defendant Denver of encouraging, condoning, tolerating, and ratifying the retaliation against those who record at public places or criticize public officials, as described herein, was the moving force behind, and proximate cause of, the violation to Ms. Benson's constitutional rights.

127.    The actions of Defendant Denver as described herein deprived Ms. Benson of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages.

128.    The acts or omissions of Defendant Denver caused Ms. Benson damages in that she suffered physical and mental pain, among other injuries, damages, and losses.

**<u>Defendant Denver was deliberately indifferent to its unconstitutional customs and practices.</u>**

129.    Through Defendant Denver's continuous ratification of its officers' unconstitutional conduct, as described above, Defendant Denver has condoned the conduct of its officers and sent the message that it will not discipline them for violating the Constitution.

130.    Defendant Denver knew or had constructive knowledge, based on the customary actions of its officers described above and its condoning of those actions, that its officers would retaliate against those who criticized the police, like Ms. Benson.

131.    Defendant Denver could have and should have pursued reasonable methods for prohibiting the widespread customs and practices outlined above but affirmatively chose not to do so by refusing to discipline its officers who unconstitutionally retaliated against those exercising her First Amendment rights.

132.    Defendant Denver could have and should have pursued reasonable methods for disciplining its officers to make clear that it does not condone such constitutional violations but failed to do so.

133.    Defendant Denver knew, or should have known, that its employees would retaliate against Ms. Benson for recording police activity and speaking critically of police officers, thereby violating Ms. Benson's constitutional rights.

134.    Defendant Denver was deliberately indifferent to Ms. Benson's constitutional rights, because Defendant Denver knew that individuals in Ms. Benson's position would be at a substantial risk of suffering dangerous consequences from Defendant Denver condoning and establishing the multiple unconstitutional customs and practices outlined above.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment Violation**
**Free Speech, Petitioning, and Association**
*Plaintiff Against All Defendants*

135.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

136.    At all times relevant to this Complaint, Defendants were acting under the color of law.

137.    Plaintiff was engaged in protected speech, petitioning, and association.

138.    Plaintiff's speech was on a matter of public concern and did not violate any law.

139.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

140.    Defendants' conduct was a viewpoint-based restriction on Plaintiff's speech, petitioning, and/or association.

141.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known.

142.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

143.    Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

144.    Defendant Denver was aware of widespread retaliation by its law enforcement officers against those exercising First Amendment rights, as detailed above, and failed to properly discipline its employees for retaliation.

145.    Defendant Denver knew, or should have known, that its employees would retaliate against those exercising First Amendment rights and would retaliate against Plaintiff constitutional rights.

146.    Defendant Denver's customs and practices condoning its employees' retaliation were the moving force and proximate cause of the violation to Plaintiff's constitutional rights.

147.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment
### Retaliation
*Plaintiff Against All Defendants*

148.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

149.    At all times relevant to this Complaint, Defendants were acting under the color of law.

150.    Plaintiff was engaged in protected speech, petitioning, and association.

151.    Plaintiff's speech was on a matter of public concern. Plaintiff's association did not violate any law.

152.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech, petitioning, and/or association rights.

153.    Defendants' conduct was a viewpoint-based restriction on Plaintiff's speech, petitioning, and association.

154.    Defendants responded to Plaintiff's protected speech, petitioning, and association activity with retaliation.

155.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of her free speech, petitioning, and association rights.

156.    Defendants sought to punish Plaintiff for exercising her free speech, petitioning, and association rights, to silence her future speech, petitioning, and association, to stop them from continuing to speak, petitioning, and associate, and to restrict her freedom of expression, petitioning, and association, along with the future speech, petitioning, and association of others.

157.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech and association activity.

158.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known.

159.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

160.    Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

161.    Defendant Denver was aware of widespread retaliation by its law enforcement officers against those exercising First Amendment rights, as detailed above, and failed to properly discipline its employees for retaliation.

162.    Defendant Denver knew, or should have known, that its employees would retaliate against those exercising First Amendment rights and would retaliate against Plaintiff, violating her constitutional rights.

163.    Defendant Denver's customs and practices condoning its employees' retaliation were the moving force and proximate cause of the violation to Plaintiff's constitutional rights.

164.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

### THIRD CLAIM FOR RELIEF[1]
### C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10
### Freedom of Speech and Association
*Plaintiff Against Defendants Levens, Bell, and Sanchez*

165.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

166.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

167.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

168.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the

---

[1] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10. This protects the right to speak and associate.

169.    The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

170.    Plaintiff was engaged in protected speech and association.

171.    Plaintiff's speech was on a matter of public concern and did not violate any law.

172.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

173.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's speech and association.

174.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the rights of Plaintiff.

175.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

**FOURTH CLAIM FOR RELIEF[2]**
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10**
**Freedom of Speech and Association – Retaliation**
*Plaintiff Against Defendants Levens, Bell, and Sanchez*

176.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

177.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer at all times relevant to the allegations in this Complaint.

---

[2] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

178.   Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

179.   The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10. This protects the right to speak and associate.

180.   The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

181.   Plaintiff were engaged in protected speech and association.

182.   Plaintiff's speech was on a matter of public concern and did not violate any law.

183.   Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

184.   Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's speech and association.

185.   Defendants responded to Plaintiff's protected speech and association activity with retaliation.

186.   Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of her free speech and association rights.

187.   Defendants sought to punish Plaintiff for exercising her free speech and association rights, to silence her future speech and association, to stop her from continuing to

speak and associate, and to restrict her freedom of expression and association, along with the future speech and association of others.

188.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech and association activity.

189.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the rights of Plaintiff.

190.    Defendants' action and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

**FIFTH CLAIM FOR RELIEF[3]**
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 24**
**Freedom to Petition**
*Plaintiff Against Defendants Levens, Bell, and Sanchez*

191.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

192.    Defendants acted under color of state law, and within the course and scope of her employment, in her capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

193.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

194.    The Petitioning Clause to the Colorado Constitution provides that "[t]he people have the right peaceably to assemble for the common good, and to apply to those invested with the powers of government for redress of grievances, by petition or remonstrance." Colo. Const. Art. II, Section 24.

---

[3] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

195.    The petitioning rights protected by Colo. Const. Art. II, Section 24 are more expansive than those protected by the First Amendment to the United States Constitution.

196.    Plaintiff was engaged in protected petitioning.

197.    Plaintiff's petitioning was on a matter of public concern and did not violate any law.

198.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her petitioning rights.

199.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's petitioning.

200.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the rights of Plaintiff.

201.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

**SIXTH CLAIM FOR RELIEF[4]**
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 24**
**Freedom to Petition – Retaliation**
*Plaintiff Against Defendants Levens, Bell, and Sanchez*

202.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

203.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

---

[4] Plaintiff bring these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

204.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

205.    The Petitioning Clause to the Colorado Constitution provides that "[t]he people have the right peaceably to assemble for the common good, and to apply to those invested with the powers of government for redress of grievances, by petition or remonstrance." Colo. Const. Art. II, Section 24.

206.    The petitioning rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

207.    Plaintiff were engaged in protected petitioning.

208.    Plaintiff's petitioning was on a matter of public concern and did not violate any law.

209.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her petitioning rights.

210.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's petitioning.

211.    Defendants responded to Plaintiff's protected petitioning activity with retaliation.

212.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of her petitioning rights.

213.    Defendants sought to punish Plaintiff for exercising her petitioning rights, to silence her future petitioning, to stop her from continuing to petition, and to restrict her freedom to petition, along with the future petitioning by others.

214.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected petitioning activity.

215.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the rights of Plaintiff.

216.    Defendants' action and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including, but not limited to the following:

a.  All appropriate relief at law and equity;

b.  Declaratory relief;

c.  Injunctive relief;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

   1.  Issuance of a formal written apology from each Defendant to Plaintiff;

   2.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

   3. Mandatory training designed to avoid future similar misconduct by Defendants;

h. Pre-judgment and post-judgment interest at the highest lawful rate;

i. Attorney's fees and costs; and

j. Such further relief as justice requires.

## REQUEST FOR TRIAL BY JURY

Plaintiff demands a jury trial on all issues so triable.

Dated this 29th day of June 2025.

NEWMAN | MCNULTY

*s/ Andy McNulty*

_____

Andy McNulty
Mari Newman
Madeline Leibin
1490 N. Lafayette Street
Suite 304
Denver, Colorado 80218
(720) 850-5770
andy@newman-mcnulty.com
mari@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFF