# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:25-cv-02005

REGAN BENSON,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality, *et al.*,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Regan Benson, by and through her counsel, Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN | MCNULTY, moves to enjoin Defendants' unlawful ban of her from serving on the Denver Police Department ("DPD") Use of Force ("UOF") Review Board, and states in support as follows:

## 1. INTRODUCTION

Plaintiff Regan Benson is a known critic of the DPD, its rampant misconduct, and its criminalization of homelessness. Because of her views on police misconduct, and her multiple lawsuits that have sought to hold DPD accountable for its misconduct, Ms. Benson has been barred from exercising her right as a citizen to participate in her local government. Specifically, Ms. Benson sought to serve on the DPD UOF Review Board, which reviews DPD officers uses of force to ensure they align with DPD policy. According to DPD Chief Ron Thomas, the UOF Review Board has been plagued by a lack of applicants for the past few years. Seeking to serve her community, Ms. Benson attempted to apply for a position on the UOF Review Board. Instead of being appreciative that Ms. Benson was willing to volunteer her time to serve, three high-

ranking DPD officials (Commander Hans Levens, Commander Joel Bell, and Deputy Chief Aaron Sanchez) barred her from even applying to serve on the UOF Review Board because of her "history" with the DPD. The "history" they were referencing was Ms. Benson's longstanding outspoken criticism of DPD misconduct and successful lawsuits holding DPD accountable for its violation of her rights. Because Ms. Benson is a critic of DPD, she was prevented from serving on the UOF Review Board.

Allowing Defendants to silence critics and allow only those who share their viewpoint to serve on the UOF Review Board has dire consequences. It undermines one of the fundamental purposes of the First Amendment. *See Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–76 (1976). Defendants, by only allowing those who are not critical of the DPD to serve on the UOF Review Board, are essentially using the UOF Review Board to curate abject lies and propaganda. Over time, their approach to censoring critics will lead to the false impression that the DPD's use of force against citizens is not only completely acceptable, but that an "independent" panel of citizens believe that the DPD does not have a problem in its ranks with excessive force. The First Amendment must remain a bulwark against any governmental impulse to "silence dissent," "distort the marketplace of ideas," and "remove certain ideas or perspectives from a broader debate." *Matal v. Tam*, 137 S. Ct. 1744, 1766–67 (2017) (Kennedy, J., concurring in part and concurring in the judgment). Ms. Benson files this preliminary injunction to uphold the First Amendment and overturn her ban on serving on the UOF Review Board.

## 2. FACTUAL BACKGROUND

Ms. Benson is a vocal advocate for homelessness rights in Denver. **Exhibit 1**, *Declaration of Regan Benson*, ¶ 2. She runs her own nonprofit organization, Helping Hands for

Dignity, that provides support for houseless individuals in South Denver. *Id.* Ms. Benson helps houseless individuals in various ways, including speaking with houseless individuals, ensuring that houseless individuals make important appointments, working with houseless individuals to obtain housing, helping houseless individuals clear warrants, and trying to get houseless individuals possessions back when they are unlawfully seized by the DPD. *Id.* Because of the DPD misconduct she has seen in the treatment of houseless individuals, Ms. Benson is a passionate advocate for not only the houseless, but also for police reform. *Id.* Because of her advocacy, Ms. Benson has been repeatedly targeted by DPD officers, through arrests, harassment, and intimidation. *Id.*, ¶ 3. DPD officers know her by name, including Defendants. *Id.*

On January 25, 2025, Ms. Benson emailed the DPD Public Information Office to request information about joining the UOF Review Board:

> Hello-
>
> I would  like information on the process to be on the use of force board.
>
> Thank you.
>
> Regan M Benson
> Sent from my iPhone

*Id.,* ¶ 4.

In response, an unnamed member of the DPD PIO emailed Ms. Benson and told her the process for joining the UOF Review Board (including that she would need to be nominated by either a City Council member or DPD official):

Hello,

The policy regarding Use of Force Board Procedures is available in the Operations Manual Section 105.05.  Current policy is that two community members "selected and trained by the department" are voting members of the Use of Force Board.

City Council members and DPD personnel nominate names of individuals who are reliable, unbiased, and have a vested interest in serving the community through the Use of Force Board process.  The nominees will undergo a background check, participate in a ride-along with a DPD officer, and attend a Community Academy. After completing these steps, if the nominee is interested in joining the Use of Force Review Board, they will interview with representatives of the DPD, the Office of the Independent Monitor (OIM), and/or the COB for final selection.

1. Selected candidates will undergo training including a hands-on training on all forms of DPD's Less-Lethal alternatives, and instruction on The Crisis Intervention Team (CIT) Program and DPD Policies including Use of Force and Firearms
2. Selected candidates must be willing to participate in a minimum of two Board meetings per year (including 20 – 30+ hours of case review prior to each Board meeting) for a term of three years and sign a confidentiality declaration. Depending on the number of Board reviews that may be needed, and the number of community Board members available, actual participation may vary.

<image001.png>

Media Relations Unit
Denver Police Department | City and County of Denver
Phone: (720) 913-6028 | 24/7 Media: (720) 663-8203
311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

*Id.*, ¶ 5.

Ms. Benson responded by inquiring how exactly nominations happen:

Thank you for the information.

What is the more defined process of HOW cc members and DPD personnel make the nominations? I'm not finding that process in any policies or within city charter.

Regards
Regan M. Benson

"The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

*Id.*, ¶ 6

The unnamed member of the DPD PIO did not provide additional information, but

referred Ms. Benson to Defendant DPD Commander Hans Levens:

Hello,

There is no other charter or policy related to selecting someone for the board. As previously stated in the email, City Council members and DPD personnel nominate names of individuals who are reliable, unbiased, and have a vested interest in serving the community through the Use of Force Board process. Once they complete the requirement to participate in a police ride along and attend a community academy, they will interview with representatives of the DPD, the Office of the Independent Monitor (OIM), and/or the COB for final selection. Any suggestions for nominees can be emailed to Commander Hans Levens(Hans.Levens@denvergov.org).

Thank you,

<image001.png>        Media Relations Unit
                      Denver Police Department | City and County of Denver
                      Phone: (720) 913-6028 | 24/7 Media: (720) 663-8203

        311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

*Id.*, ¶ 7.

Ms. Benson followed up by clarifying that, without a nomination, a citizen cannot serve

on the UOF Review Board:

5

> Thank you.
>
> So if a person is not "nominated" by DPD and city council members, they cannot begin the process of completing the other requirements?
>
> Regan M Benson
> Sent from my iPhone

*Id.*, ¶ 8.

The unnamed member of the DPD PIO confirmed that, without a nomination, a citizen cannot serve on the UOF Review Board:

> Correct. The first step would be the nomination. Then the other requirements would need to be completed.
>
> Thanks,
>
> <image001.png>       Media Relations Unit
>                       Denver Police Department | City and County of Denver
>                       Phone: (720) 913-6028 | 24/7 Media: (720) 663-8203
>
>       311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

*Id.*, ¶ 9.

Ms. Benson, seeking to serve on the UOF Review Board, asked additional questions about how an individual can be nominated:

> What are the requirements for the nomination from DPD?
> How many members of cc are required for a nomination?
>
> Regan M Benson
> Sent from my iPhone

*Id.*, ¶ 10.

When the unnamed member of the DPD PIO did not respond to Ms. Benson's email, she

reached out to Defendant Levens to seek further clarification on the process to join the UOF

Review Board:

> Hello Commander Levens-
>
> I've been asking some questions through the PIO, not sure who's been responding because they wont sign their name to any of the communications but they've stopped responding to my questions and since they referred to you last as the person that takes nominations for the use of force review board, can you please provide me with these answers that I need.
>
> I've been told that to be part of the use of force board as a citizen, a nomination process must occur first and what I was told is not outlined in any DPD policy or charter language so I need to know:
>
> 1. How many city council members must nominate a person to you?
> 2. What is the DPD process for obtaining nominations? Does a person fill out a form? Ask you? Ask any DPD personnel for a recommendation? How does DPD personnel give and get a nomination to you, for a citizen requesting participation in the use of force review board?
>
> Thank you.
>
> Regards
> Regan M. Benson
>
> "The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

*Id.*, ¶ 11.

Defendant Levens answered Ms. Benson's questions, then asked if she was inquiring

because she wanted to serve on the UOF Review Board herself:

> Regan,
>
> There is no specific number of individuals that city council must nominate.  If a city council member nominates an individual to go through the process to potentially sit on the UOF board then that city council person is putting their name behind that community member and is affirming that their nominee is reliable, unbiased, and has a vested interest in serving the community through the Use of Force Board process.  DPD personnel (primarily command officers) may refer an individual with the belief that that person is reliable, unbiased, and has a vested interest in serving the community through the Use of Force Board process.  Any potential nominations or community members that would be good candidates are then forwarded to me where I will establish communication with them and ask that they participate in a DPD ride-along to start.  Community members must be residents of Denver.  If a community member has an interest in participating in the UOF board, they can reach out to the Commander in the District in which they reside.  I will vet any interested community members before deciding to proceed with a background check and potential interviews.
>
> Are you inquiring for yourself?
>
> Thanks,
>
> <image001.png>                                    **Hans Levens** | Commander

*Id.*, ¶ 12.

Ms. Benson responded that she was, indeed, asking about the UOF Review Board process because she wished to join the UOF Review Board, and asked Defendant Levens an additional question about the process:

> I am inquiring for myself, yes. This is also the first time it's been mentioned a person must be a Denver resident. But understandable.
>
> So the city council /command staff nomination is a may not a must, process?
>
> Regan M Benson
> Sent from my iPhone

*Id.*, ¶ 13.

In response, Defendant Levens told Ms. Benson that there was an exception to the nomination requirement, which was that Defendant Levens would assess those who might be interested in  joining the UOF Review Board but had not been nominated on a case-by-case basis:

> If an individual does not get nominated by CC or a Commander, they can reach out to me.  I will look at those persons who may be interested on a case-by-case basis.
>
> <image001.png>      **Hans Levens** | Commander
> Denver Police Department | Conduct Review Bureau
> City and County of Denver
> phone: (720) 913-6528
> 311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

*Id.*, ¶ 14.

A few hours after receiving this information from Defendant Levens, Ms. Benson emailed Defendant DPD Commander Joel Bell to seek a nomination to join the UOF Review Board. Ms. Benson resides in DPD District Three, and Defendant Bell was the Commander for District Three. Ms. Benson asked Defendant Bell to nominate her to join the UOF Review Board:

Hello Commander Bell-

I am writing to you as a follow to process defined to me by Commander Levens.

While it is not defined in department policy or city charter, it is apparently considered part of an arbitrary process to receive a nomination to begin the process of serving on the use of force board for the Denver PD. I was told the nomination may be made the commander of the district I reside in. That is district 3.

I am asking that you nominate me to begin this process. The process defined to me, is to nominate me by emailing Commander Levens. I'm not sure what process you require to nominate me, but please advise.

Regards
Regan M. Benson

"The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

*Id.*, ¶ 15.

Instead of responding to Ms. Benson's email, Defendant Bell called Defendant Levens. Defendant Bell and Defendant Levens jointly decided, and conspired, to reject Ms. Benson from joining the UOF Review Board because she has been a vocal critic of misconduct by the DPD. *Id.*, ¶ 16. They decided that Ms. Benson would not even be allowed to apply for the UOF Review Board. *Id.* Defendant Bell never responded to Ms. Benson's email requesting a nomination. Instead, a few hours after emailing Defendant Bell, Ms. Benson received an email from Defendant Levens informing her that she would not be considered for the UOF Review Board because of her "history with DPD":

Regan,

I was advised that you reached out to Commander Bell, seeking a recommendation from him to be considered for the UOF board.  I apologize, I believed that you lived outside of Denver. Either way,  you will not be considered because of your history with DPD.

Thanks,

<image001.png>                    **Hans Levens** | Commander
                            Denver Police Department | Conduct Review Bureau
                            City and County of Denver
                            phone: (720) 913-6528
            311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

*Id.*, ¶ 16.

Ms. Benson's "history with DPD" is that she is a longstanding critic of the department. *Id.*, ¶ 17. Further, she has successfully sued DPD on multiple previous occasions for violating her rights. *Id.* It was due to this measured, and valid, criticism of DPD that Defendant Levens and Defendant Bell barred her from even applying for the UOF Review Board. *Id.*

In response to Defendant Levens' email, Ms. Benson asked Defendant Levens for clarification what he meant by her "history" with DPD:

Commander Levens- I answered your question earlier when you asked me if I was inquiring for myself.
Odd series of responses.

"My history"?

What about "my history" disqualifies me to sit on a citizen panel?

Regan M Benson
Sent from my iPhone

11

> Commander Levens-
>
> Who do I appeal your decision to, since I'm not getting a response as to why my history with DPD disqualifies me to go through this process?
>
> Regan M Benson
> Sent from my iPhone

*Id.*, ¶ 18.

In response, Defendant Levens doubled down and made it abundantly clear that Ms.

Benson's history of criticism of the DPD was the reason for her being barred from joining the

UOF Review Board:

> Regan,
>
> When I say, "because of your history with DPD", I'm referring to the fact that you are biased. We are looking for community members that are impartial. The Chief of Police is not available today, but you are welcome to email Division Chief Aaron Sanchez at aaron.sanchez@denvergov.org
>
> Thanks,
>
>           **Hans Levens** | Commander
> Denver Police Department | Conduct Review Bureau
> City and County of Denver
> phone: (720) 913-6528
>                    311 | pocketgov.com | denvergov.org | Denver 8 TV | Facebook | Twitter | Instagram

*Id.,* ¶ 19

Ms. Benson appealed Defendant Levens' decision to bar her from even applying to serve

on the UOF Review Board to Defendant DPD Division Chief Aaron Sanchez:

> Chief Sanchez-
>
> I am emailing you in response to Hans telling me that I cannot go through the process for the use of force board, citizen selection.

> He states I have a history with DPD so that disqualifies me because according to him, I am biased.
>
> So this communication is following his process after I asked him who I appeal his decision to.
>
> I am asking to go through the process to serve in the citizen capacity on the use of force board.
>
> Regards
> Regan M. Benson
>
> "The further society drifts from the truth, the more it will hate those that speak it." ~George Orwell

*Id.*, ¶ 20.

Defendant Sanchez informed Ms. Benson that Defendant Levens was a final policymaker for Denver with respect to the UOF Review Board application and nomination process. *Id.,* ¶ 21. Defendant Sanchez affirmed Defendant Levens' decision, which was based on Ms. Benson's criticism of DPD, and continued to bar her for even applying to serve on the UOF Review Board:

> Hello Regan,
>
> Thank you for your inquiry and interest in the Use of Force Review Board. Based on our process, the decision of Commander Levens is final. At this time, you will not be considered for the UFRB. I do appreciate your follow up.
>
> Thank you,
>
>  Aaron Sanchez | Division Chief of Patrol
> Denver Police Department | City and County of Denver
> 720-913-6527 Main |
> aaron.sanchezt@denvergov.org

*Id.* To this day, Ms. Benson remains barred from even applying to serve on the UOF Review Board because she is a critic of DPD misconduct. *Id.*, ¶ 22.

This is not the first time that Ms. Benson has been targeted herself by the DPD. *Id.*, ¶ 23-

25. In fact, she has been repeatedly targeted by the DPD for her speech that is critical of it. *Id.*

She has filed two successful First Amendment lawsuits because of retaliation by the DPD. *Id.*

2. **L**EGAL **A**RGUMENT

To succeed on a preliminary injunction motion, the moving party must show: (1) that she's substantially likely to succeed on the merits; (2) that she will suffer irreparable injury if the court denies the injunction; (3) that her threatened injury (without the injunction) outweighs the opposing party's under the injunction; and (4) that the injunction is not adverse to the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). Ms. Benson meets all of these factors.

4.1 **Ms. Benson is likely to succeed on the merits of her First Amendment claims.**

4.1.1 **Ms. Benson's speech, including her lawsuits against DPD and criticism of DPD, is fully protected under the First Amendment.**

"[T]he First Amendment's core purposes [are] to protect free and robust discussion of public affairs, hold government officials accountable, and check abuse of power." *Irizarry v. Yehia*, 38 F.4th 1282, 1295 (10th Cir. 2022). "[E]xpression on public issues has always rested on the highest rung of the hierarchy of First Amendment values" and "[s]peech concerning public affairs is more than self-expression; it is the essence of self-government[.]" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). Particularly, "[l]itigation on matters of public concern may facilitate the informed public participation that is a cornerstone of democratic society" and "[i]t also allows individuals to pursue desired ends by direct appeal to government officials charged with applying the law." *Borough of Duryea v. Guarnieri,* 564 U.S. 379, 397 (2011). Ms. Benson's speech and lawsuits[1] that raised serious concerns about misconduct within the DPD

---

[1] Ms. Benson's lawsuits sought, and achieved, substantive policy changes within the DPD through injunctive relief and, by doing so, "assumed an added dimension" with respect to

clearly constituted protected First Amendment activity. *See Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) (stating that "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import"); *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007).

> ### 4.1.2 Defendants' decision to bar Ms. Benson from even applying to serve on the UOF Review Board is an unconstitutional viewpoint-based restriction on Ms. Benson's speech.

"[W]hen the government moves beyond restricting the subject matter of speech and targets 'particular views taken by speakers on a subject,' such viewpoint discrimination is 'presumed impermissible.'" *Summum v. Callaghan*, 130 F.3d 906, 917 (10th Cir. 1997) (quoting *Rosenberger v. Rector*, 515 U.S. 819, 829 (1995)). In any forum, "an effort to suppress expression merely because public officials oppose the speaker's view" is unconstitutional. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985); *see also Mesa v. White*, 197 F.3d 1041, 1047 (10th Cir. 1999) ("[V]iewpoint discrimination is almost universally condemned and rarely passes constitutional scrutiny... Viewpoint discrimination is an egregious form of content discrimination.").

"Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (citing *Rosenberger v. Rector*, 515 U.S. 819, 829 (1995)). Importantly, "[t]he adoption of a facially neutral policy for the purpose of suppressing the expression of a particular viewpoint is viewpoint discrimination." *Christian Legal Soc'y Chapter of the Univ. of Cal. v.*

---

protection under the First Amendment as they sought "to advance political, social, or other ideas of interest to the community as a whole[.]" *Borough of Duryea,* 564 U.S. at 394.

*Martinez*, 561 U.S. 661, 736 (2010). Governmental viewpoint discrimination is unconstitutional no matter the forum. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S. Ct. 948, 955 (1983) (stating that even in nonpublic fora, the government must wield that control in a way that is viewpoint neutral and not a subterfuge "to suppress expression merely because public officials oppose the speaker's view"); *Ark. Educ. Tv Comm'n v. Forbes*, 523 U.S. 666, 682 (1998).

"The prohibition on viewpoint discrimination applies equally to the imposition of penalties and the denial of benefits." *AP v. Budowich*, No. 25-5109, 2025 U.S. App. LEXIS 13980, at *44-45 (D.C. Cir. June 6, 2025); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (holding that the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech"). Even where a government program is designed to support a small number of speakers selected on discretionary, aesthetic criteria, it may not impose restrictions intended to punish "certain ideas or viewpoints." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586-87 (1998) (citation omitted); AP v. Budowich, No. 1:25-cv-00532 (TNM), 2025 U.S. Dist. LEXIS 66994, at *44-45 (D.D.C. Apr. 8, 2025).

Here, Defendants singled out Ms. Benson. They have allowed others, who have not engaged in the criticism that Ms. Benson has engaged in, to serve on the UOF Review Board, while rejecting Ms. Benson (without even allowing her to apply) because she has been critical of the DPD. This favoring of certain viewpoints over others is unconstitutional viewpoint discrimination. *See Summum*, 130 F.3d at 919; *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992) (holding that a viewpoint-based restriction on unprotected speech was unconstitutional); *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1230-31 (10th Cir. 2021); *MacQuigg v. Albuquerque Pub.*

*Schs. Bd. of Educ.*, Civ. No. 12-1137 MCA/SCY, 2015 U.S. Dist. LEXIS 199430, 2015 WL 13650030, at *7 (D.N.M. Feb. 6, 2015) (concluding that "a reasonable jury could find that the justifications offered by Defendant for banning Plaintiff were pretexts masking viewpoint discrimination, and that Defendant targeted Plaintiff precisely 'because of' Plaintiff's unwelcome criticism of the Board's administration of APS and of Defendant, personally"); *see also AP v. Budowich*, No. 1:25-cv-00532 (TNM), 2025 U.S. Dist. LEXIS 66994, at *27-28 (D.D.C. Apr. 8, 2025) (holding that Trump administration's banning of the AP from participating in the press pool because of their critical coverage of the administration was unconstitutional viewpoint discrimination); *Jenner v. United States DOJ*, Civil Action No. 25-916 (JDB), 2025 U.S. Dist. LEXIS 99015, at *32 (D.D.C. May 23, 2025) (holding that executive order targeting law firms that were perceived by the Trump administration as critical of the administration was unconstitutional viewpoint discrimination).

Even assuming that a compelling government interest could overcome viewpoint discrimination, which the caselaw is clear it cannot, Defendants' restriction of Ms. Benson's speech is not "narrowly drawn to effectuate a compelling state interest." *Summum*, 130 F.3d at 917. Ms. Benson is a perfect candidate for sitting on the UOF Review Board. She would be rigorous in holding DPD officers accountable and that is exactly how the UOF Review Board is supposed to function. By rejecting all critics of the DPD, Defendants have carefully curated the UOF Review Board decisions as pro-DPD propaganda. The UOF Review Board is used as a cudgel to present the front that the DPD actually takes citizen input seriously while, in actuality, the DPD continues to vigorously police the thin blue line. This offends our most sacred and basic constitutional values. It clearly violates the First Amendment.

### 4.1.3 Defendants' ban on Ms. Benson from applying to the UOF Review Board is unconstitutional retaliation in violation of the First Amendment.

To demonstrate retaliation in violation of the First Amendment, a plaintiff must simply demonstrate that (1) she was "engaged in constitutionally protected activity[,]" (2) Defendants' actions caused her "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity[,]" and (3) that Defendants' actions were "substantially motivated" by her engagement in constitutionally protected activity. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). As outlined above in **Section 4.1.1**, Ms. Benson was engaged in constitutionally protected activity.

Additionally, Defendants' actions would chill a person of ordinary firmness and, in fact, have chilled Ms. Benson, who has not been able to apply for the UOF Review Board. Courts have routinely held in First Amendment cases that because "there is no justification for harassing people for exercising their constitutional rights . . . [the chilling effect on future speech] need not be great in order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *Garcia v. City of Trenton*, 348 F.3d 726, 727-29 (8th Cir. 2003) (holding that two relatively inexpensive parking tickets was sufficient to deter a person of ordinary firmness from exercising their rights). The Supreme Court has stated that even an act as "trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights" is actionable. *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8 (1990). Under this standard, Ms. Benson has been chilled.

Finally, demonstrating that Defendants' actions "substantially motivated" by Ms. Benson's First Amendment protected activity is straightforward. Defendants told Ms. Benson that she would not be allowed to apply for the UOF Review Board because of her "history" with the DPD, which

included her criticism of the DPD and lawsuits against the DPD. This reference to Ms. Benson's advocacy by Defendants in their retaliatory action demonstrates a causal connection. *See Worrell*, 219 F.3d at 1213-14; *Van Deelen*, 497 F.3d at 1157-58; *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990).

### 4.1.5 Denver is municipally liable for the unconstitutional ban.

"Local governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 (1978). "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Defendants were final policymakers for purposes of determining who can serve on the UOF Review Board. Ms. Benson appealed Defendant Levens' decision to deny her ability to even apply to the DPD UOF Review Board to Defendant Sanchez, who was the final authority for determining who could apply to the UOF Review Board. Therefore, their decisions are directly attributable to Denver itself.

Additionally, courts have held that a personal targeting of one individual for engaging in protected speech is enough to establish municipal liability. *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1276 (D. Colo. 2018); *see generally Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1951 (2018). Here, there is strong evidence that Ms. Benson has been repeatedly targeted by Denver for her speech that is critical of the DPD. This is enough to hold Denver liable for the actions of its officers.

### 4.2 <u>Ms. Benson is likely to succeed on the merits of her Colorado Constitutional claims.</u>

Colorado courts have repeatedly held that Colo. Const. Art. II, Section 10 provides "greater protection for individual freedom of expression than the Federal Constitution." *Curious Theatre Co. v. Colo. Dep't of Pub. Health & Env't*, 220 P.3d 544, 551 (Colo. 2009); *Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo. 1991); *People v. Ford,* 773 P.2d 1059 (Colo. 1989); *Parrish v. Lamm,* 758 P.2d 1356, 1365 (Colo. 1988); *People v. Seven Thirty-Five East Colfax, Inc.,* 697 P.2d 348, 356 (Colo. 1985); *People v. Berger,* 521 P.2d 1244 (Colo. 1974); *In Re Hearings Concerning Canon 35,* 296 P.2d 465 (Colo. 1956). Particularly, Colorado courts have held that the forum analysis for claims under the Colorado Constitution's free speech clause is much more lenient, even allowing for First Amendment claims where rights are violated on private property and other fora where First Amendment protections are considered weaker under federal law. *See Bock*, 819 P.2d at 55. Given the broader protections of Colo. Const. Art. II, Section 10, and that Ms. Benson has shown that she is likely to succeed on her claims under the First Amendment, she can also show a likelihood of success on her claims under the Colorado Constitution.

### 4.3 <u>Stopping the violation of Ms. Benson's constitutional rights prevents irreparable harm, is consistent with the balance of the equities in this case, and does not harm the public interest.</u>

Where, as here, Ms. Benson demonstrates that her constitutional rights have been violated, it follows that granting injunctive relief: (1) prevents irreparable harm, (2) is consistent with the balance of the equities in this case, and (3) is in the public interest. *Free the Nipple-Fort Collins*, 916 F.3d at 806-07. First, "well-settled law supports the constitutional-violation-as-irreparable-injury principle." *Id.* at 806 (citing *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) and *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Second, when a constitutional right hangs in the balance "even

a temporary loss [of that right] usually trumps any harm to the defendant." *Free the Nipple-Fort Collins*, 916 F.3d at 806; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013). Third, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012); *Free the Nipple-Fort Collins*, 916 F.3d at 807. For these reasons, the three factors tip strongly in favor of granting Ms. Benson a preliminary injunction.

### 4.4 **This Court should not require bond.**

Under Federal Rules of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction. This includes the authority to set a nominal bond. *See Denver Homeless Out Loud v. Denver*, 514 F. Supp. 3d 1278, 1307 (D. Colo. 2021), *rev'd on other grounds Denver Homeless out Loud v. Denver*, 32 F.4th 1259 (10th Cir. 2022); *see also* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2017 update) (citing public rights cases where the bond was excused or significantly reduced). This Court should waive bond because the requested interim relief is in the public interest, *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002), and the injunction is necessary to vindicate constitutional rights. *Complete Angler, L.L.C. v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009).

### 5. CONCLUSION

For the above-stated reasons, Plaintiff asks that this Court enjoin Defendants' ban on Ms. Benson applying to serve on the UOF Review Board and grant this motion in its entirety.

Dated this 29th day of June 2025.

NEWMAN | MCNULTY

*s/ Andy McNulty*
Andy McNulty
Mari Newman

Madeline Leibin
1490 N. Lafayette Street
Suite 304
Denver, CO 80218
(720) 850 - 5770
andy@newman-mcnulty.com
mari@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFF