IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02005-PAB

REGAN BENSON

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
HANS LEVENS, in his individual and official capacities,
JOEL BELL, in his individual and official capacities,
AARON SANCHEZ, in his individual and official capacities,

    Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF [ECF Doc No. 2][1]

Defendants, City and County of Denver, a municipality; Hans Levens, in his individual and official capacities; Joel Bell, in his individual and official capacities; and Aaron Sanchez, in his individual and official capacities; hereafter "Defendants," by and through their attorneys at Nathan Dumm & Mayer P. C., hereby submit their response to Plaintiff's Motion for Injunctive Relief, and state as follows:

### INTRODUCTION

An injunction that seeks to alter the status quo, mandates an affirmative act by the defendant, or affords all the relief a plaintiff could expect to win at trial is a "disfavored injunction." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). Disfavored injunctions must be "more closely scrutinized" and require "a strong showing" of "likelihood of

---

[1] The title of ECF Document No. 2 is "Complaint and Jury Demand," but the document itself is a Motion seeking injunctive relief.

success on the merits" and the balancing of the relative harms in a plaintiff's favor. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004); *Colo. v. U.S. Env't Protection Agency*, 989 F.3d 874, 884 (10th Cir. 2021). Here, Plaintiff ("Plf") alternatively seeks an order allowing her to serve on the Denver Police Department ("DPD") Use of Force Review Board ("Board") or to accept her application to serve on the Board.[2] In either instance, the relief requested would require the DPD to affirmatively act by either repeating the processing of her application to serve on the Board or placing her on the Board. As such, Plf's request for an injunction is disfavored. Furthermore, where the Board is a nonpublic forum with access limited by the DPD, and where DPD's restrictions are reasonable, viewpoint-neutral, and necessary to maintain the confidential investigative purpose of the Board, Plf's likelihood of success on the merits is slim at best, and the balance of harms weighs in favor of maintaining the Board's operation as a nonpublic forum.

## STANDARD OF REVIEW

The decision whether to issue a preliminary injunction is committed to a district court's sound discretion. *Allen W. Hinkel Dry Goods Co. v. Wichison Indus. Gas Co.*, 64 F.2d 881, 884 (10th Cir. 1933). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018). A party seeking preliminary injunctive relief must satisfy four factors: (1) the likelihood of success on the merits; (2) the likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the

---

[2] The precise relief requested by Plf's Motion is uncertain. *See* p. 1 requesting that she serve on the Board, *and* p. 21 requesting that DPD accept her application to serve.

movant's favor; and (4) the injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015) (internal quotations omitted). A "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F.App'x 760, 766 (10th Cir. 2014).

## **FACTUAL BACKGROUND**[3]

1. Plf describes herself as a "passionate advocate for not only the houseless, but also for police reform," who is "well-known" by the DPD because she "regularly criticizes DPD officers" and "films them in the performance of their duties." (Compl., ¶ 13, 14; Decl. of Regan Benson, ¶ 3).

2. The DPD Board conducts confidential, internal investigations into serious incidents involving the use of force by DPD officers, and the Board includes two membership seats for volunteer civilians. (DPD Operations Manual, attached as Exhibit A, §§ 105.05(1) and 105.05(1)(b)(1), 105.05(4), and 105.05(5)).

3. On January 25, 2025, Plf emailed the DPD Public Information Office seeking information about the process for joining the Board. (Compl, ¶ 19).

4. Plf was informed via email that DPD's Operations Manual, Section 105.05, governs Board procedures; two community members "selected and trained by the department" are voting members of the Board; community member candidates are nominated by the City Council or DPD personnel and must be reliable, unbiased, and have a vested interest in serving the community through the Board process; and nominated community members must complete a

---

[3] For the purposes of this Response only, Defendants adopt limited factual averments by Plf but reserve the right to vigorously contest Plf's recitation of facts in future hearings, as needed.

vetting process conducted by DPD at the discretion of the Chief of Police, to include extensive training, a background check, and a ride-along. (Compl., ¶ 20).

5. Upon successful completion of those steps, a nominee who remains interested in serving will interview with representatives of DPD, the Office of the Independent Monitor, and/or the Citizen Oversight Board ("COB"). (Compl., ¶ 20).

6. Selected nominees must sign a confidentiality declaration and agree to serve a term of three years. (Compl., ¶ 20).

7. Plf reached out directly to Commander Hans Levens via email inquiring about the next step, receiving a nomination for a Board position. (Compl., ¶ 23, 24, 25, 26).

8. Commander Levens reiterated that a nomination can come from a City Council Member or from the District Commander in the District where a candidate resides, and a candidate must be "reliable, unbiased, and [have] a vested interest in serving the community through the Use of Force Board process." (Compl., ¶ 27).

9. Plf clarified that she was personally interested in joining DPD's Board and requested to be nominated; she also contacted Commander Joel Bell, the Commander of District Three where Plf purportedly resides, via email requesting nomination. (Compl., ¶ 28, 30).

10. Commander Levens informed Plf via email that she would not be considered for a position on the Board due to her "history with DPD," which he defined as Plf being "biased," and that DPD was looking for "impartial" volunteers consistent with the previously articulated standards. (Compl., ¶¶ 32, 35).

11. Per Commander Levens' instruction, Plf appealed his decision to Division Chief Aaron Sanchez, acting in place of the unavailable Chief of Police. (Compl., ¶¶ 35, 36).

12. Division Chief Sanchez informed Plf, again via email, that she would not be considered for a position on the Board any further, and that "based on [their] process, the decision of Commander Levens is final." (Compl., ¶ 37).

# ARGUMENT

**A. Plaintiff is Unlikely to Prevail on the Merits.**

Plf's claims that her First Amendment rights were violated pursuant to 42 U.S.C. § 1983 and the Colorado Constitution when she was allegedly restricted from applying for membership on the Board are likely to fail where she cannot demonstrate that she was engaged in protected First Amendment activity that was infringed upon by government actors or that the restrictions were retaliatory.[4] (Compl., ¶¶ 36, 38). *VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1160 (10th Cir. 2021), quoting *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016). To sustain a claim under 42 U.S.C. § 1983, Plf is required to show that she was engaged in protected First Amendment activity, that activity was infringed upon by government actors, and the conduct of the government "would 'deter a reasonable person from exercising . . . [her] First Amendment rights.'" *Churchill v. University of Colorado at Boulder*, 293 P.3d 16, 37 (Colo. App. 2010), quoting *Couch v. Board of Trustees of Memorial Hosp. of Carbon County*, 587 F.3d 1223, 1238 (10th Cir. 2009). To further claim First Amendment retaliation, in addition to demonstrating a violation of her First Amendment rights, Plf must show that she "suffer[ed]

---

[4] Plf's state constitutional claims mirror her claims under 42 U.S.C. § 1983 and can thus be analyzed together. *See Est. of Ward by & through Ward Stamp v. Lucero*, No. 1:23-CV-00473-CNS-MDB, 2024 WL 128166, at *9 (D. Colo. Jan. 11, 2024); *see also Woodall v. Godfrey*, 553 P.3d 249, 256 (Colo. App. 2024) ("Section 13-21-131 is similar to U.S.C. § 1983"); *see also People v. Dunaway*, 88 P.3d 619, 630 (Colo. 2004); *and see People v. Brown*, 510 P.3d 579, 586 (Colo. App. 2022).

an injury that would chill a person of ordinary firmness from continuing to engage in that activity" and that "a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights." *A.M. v. Holmes*, 830 F.3d 1123, 1162 (10th Cir. 2016), quoting *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).

Courts use a three-step analysis to determine whether a purported government restriction on speech or conduct amounts to a First Amendment violation. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1219-20 (10th Cir. 2021). The courts consider: (1) whether the speech or conduct is protected by the First Amendment; (2) whether the government property in question is a traditional public forum or a nonpublic forum; and (3) the reasonableness of the government restriction depending on "the nature of the forum and whether the speech restriction is content-based or content-neutral." *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1286-87 (10th Cir. 1999), and *Brewer*, 18 F.4th at 1219-20.

1. ***Plf cannot show she was engaged in protected First Amendment activity that was infringed upon by DPD.***

Plf was not engaged in protected First Amendment activity that was infringed upon by DPD, nor was she subjected to retaliation. Plf's complaint alleges that she was prevented from applying for Board membership. (Compl., ¶¶ 37-38). To the contrary, her extensive communication with DPD leadership demonstrates that she applied for membership numerous times. Plf contacted Commander Levens, contacted the District Commander where she lived to seek a nomination, and appealed the decision not to advance her candidacy to the Division Chief via email. (Compl., ¶¶ 19-37).  Rather than being restricted from expressing her desire to join the Board, Plf had access to multiple commanding officers at DPD, all of whom she was permitted to speak with directly, and she was allowed to request nomination, which is how the vetting

process often begins. (Compl., ¶¶ 19-37). There is no formal "application" involved in the vetting process, a fact of which Plf was informed multiple times. (Compl., ¶¶ 20, 22, 24, 27, 29).

Where Plf was able to make multiple inquiries at the highest levels of leadership within DPD about her desire to be considered for Board membership, her speech was obviously not restricted for First Amendment purposes, and she was not actually prevented from "applying" to the Board. Moreover, Plf has not alleged that she was prevented from seeking nomination from a City Council member, another avenue she could have pursued. (Compl.,¶¶ 27, 29). Not only was Plf not deterred from continuing to exercise her First Amendment rights by repeatedly contacting DPD requesting to join the Board, but also a reasonable person in those circumstances would not have been deterred from exercising their First Amendment rights. The fact that Plf was not selected to continue any further with the process does not equate to a restriction on her protected First Amendment activity, nor does it amount to retaliation born of animus against her speech.

2. ***The Board is a nonpublic forum with reasonable, viewpoint-neutral restrictions placed on Community Board Membership.***

To the extent that Plf contends denial of membership on the Board is itself an unlawful restriction of her First Amendment rights, her claim similarly fails on the merits. First Amendment protected speech is still subject to limitations: "Nothing in the Constitution requires the Government to freely grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985).[5] Unlike in a public forum, access to a

---

[5] Government property for the purposes of forum analysis is somewhat inchoate and seems to encompass *participation* in a certain government forum, even in the absence of a defined

nonpublic forum can be restricted so long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials opposed the speaker's view." *Perry Education Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 46 (1983); *Hawkins*, 170 F. 3d at 1287. Contrary to Plf's averment, the Board is not "a volunteer citizen board that reviews uses of force by DPD officers to ensure they are in line with DPD policy."[6] (Complaint, ¶ 16). Instead, the Board operates as a confidential body conducting closed "internal investigations" into serious incidents involving the use of force by DPD officers. *Est. of Damon v. City and Cnty. of Denver*, No. 18-CV-00982-RBJ, 2019 WL 10252744, at *2 (D. Colo. Nov. 1, 2019); *see* Ex. A, § 105.05 (1)(b)(1). To preserve the Board's functionality as a confidential investigative body consistent with its established purpose under C.R.S. § 16-2.5-301, DPD lawfully restricts community board membership to those who are reliable and neutral. *Cornelius*, 473 U.S. at 800. That is precisely what Plf was told, Compl., ¶¶ 20, 22, 27, and what is stated in the Operations Manual at § 105.05(5)(d). (Ex. A).

Furthermore, DPD has taken multiple steps to uncontrovertibly demonstrate the Board's status as a nonpublic forum by appropriately restricting access to its membership. *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 679 (1998) (government imposition of selective access strongly indicates that the property is a nonpublic forum). Indeed, the "government does not create a designated public forum when it does no more than reserve

---

location. *Cornelius*, 473 U.S. at 802 ("a public forum may be created by government designation of a place or channel of communication . . . or for use by certain speakers, or for the discussion of certain subjects."). Thus, the Board is "government property" for the sake of forum analysis.
[6] The City of Denver maintains a Citizen Oversight Board comprised of nine citizen volunteers tasked with assessing the effectiveness of the Denver Department of Public Safety (under the umbrella of which the Denver Police Department falls). This is wholly distinct from DPD's Use of Force Review Board. *See* Denver City Charter, Title I, Article XII, § 12.1.1 (B).

eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' to use it." *Id.*, quoting *Cornelius,* 473 U.S. at 804. As in *Cornelius*, the Board has no "purposeful designation for public use," and DPD developed "extensive admission criteria to limit access" to those "considered appropriate," including individuals who are reliable, unbiased, and interested in serving their community. *Cornelius,* 473 U.S. at 804-805 (finding no public forum in the absence of those factors); (Compl. ¶¶ 20, 22, 24, 27, 29). An appropriately nominated individual then goes through an extensive vetting process at the discretion of the Chief of Police. (Ex. A, § 105.05 (5)(d)(2)). These eligibility criteria are appropriate for citizen participants who would be entrusted with extremely sensitive information as members of the Board and demonstrate DPD's intent to create a nonpublic forum.

DPD's purpose in establishing the Board further demonstrates this clear intent. The courts "will [not] infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity," and where the government has expressed a clear intent to the contrary. *Cornelius*, 473 U.S. at 803. Colorado law requires every police department in the state to create and maintain a Use of Force ("UOF") Review Board. C.R.S § 16-2.5-301. Such boards are government bodies composed almost exclusively of government employees, and there is no state requirement that UOF Review Boards include civilian members. C.R.S. § 16-2.5-301. Membership on the Board and attendance at Board meetings are strictly limited only to those governmental entities required to be present under C.R.S. § 16-2.5-301 and to certain other "persons designated by the Chief of Police or the Commander of the Conduct Review Board." (Ex. A, § 105.05(1)(b)(1)). The express purpose and mission of the Board is investigatory, and it is strictly confidential in nature. (Ex. A, §105.05 (1)(b)). Expressive activity

9

is anathema to the Board's handling of highly sensitive, private, and confidential information about serious incidents involving the use of force by DPD officers. (Ex. A). The materials discussed during Board meetings must remain private to protect the rights of those accused in criminal cases, the rights of officers under investigation, and the rights of victims and witnesses who are involved in these cases. Permitting unfettered public expressive activity at the Board would destroy its principal function as a neutral, fact-finding investigative body without prejudgment. Thus, this Court should be "particularly reluctant to hold that the government intended to designate a public forum" when it created the Board. *Cornelius*, 473 U.S. at 804. Given the Board's obvious purpose and the clear intent to maintain its nonpublic character, combined with the damage public access would cause to its functionality, the Board is clearly a nonpublic forum.

3. ***The DPD can impose reasonable, viewpoint-neutral restrictions on access to a nonpublic forum without running afoul of the Constitution.***

Simply because the Board is run by the government does not mean that access to it is guaranteed under the First Amendment. *Perry*, 460 U.S. at 46. Reasonable restrictions can be based on "subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. The government can restrict access to a nonpublic forum to avoid the inclusion of "political" groups, especially where they are disruptive or potentially disruptive: "The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Id.* at 811. To that point, "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." *Id.* at 809. By her own admission, Plf is a "longstanding outspoken . . . critic of DPD."

10

(Compl. ¶ 2). Again, by her own admission, Plf's purpose in seeking to join the Board was "in line with her penchant for holding DPD officers to account." (Compl., ¶ 16). Her stated purpose runs counter to the mission of the Board.

Despite Plf's misconception, DPD's Board does not exist to "hold officers to account" or to do so in a public, outspoken fashion. (Ex. A). Instead, the Board exists to conduct confidential, fact-based investigations, evaluations, and reviews of serious use-of-force incidents to make recommendations to the Chief of Police concerning discipline, commendation, and policy suggestions in their aftermath.[7] (Ex. A). Plf's one-sided, deeply biased political stance would be highly disruptive to the Board's legitimate functioning and would be incompatible with its purpose. Indeed, an individual who is demonstrably biased *either for or against* the police cannot be relied upon to faithfully execute their duties on the Board, nor can they be trusted to maintain confidentiality. Rejecting Plf's candidacy for a position on the Board is not retaliation; it is a reasonable response to protect the integrity of the Board, and Plf cannot show that she would have been allowed to join the Board "absent the [allegedly] retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019), quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006).

Furthermore, neutrality itself is a legitimate government interest. Consider the analogous case of jury service: although a prospective juror cannot be prevented from serving on the basis of constitutionally protected factors, *see, e.g., Batson v. Kentucky*, 476 U.S. 79 (1986), a prospective juror's bias *for or against either party* has *always* been lawful grounds for removal

---

[7] DPD has a separate process for officer discipline, as outlined in the DPD Operations Manual § 503, attached as Exhibit B.

11

of such a juror for cause, without violating the prospective juror's First Amendment or Equal Protection rights. *See Gonzales v. Thomas*, 99 F.3d 978 (10th Cir. 1996).

Based on their long history of interactions with Plf and her own stated purposes, it was reasonable for DPD to doubt that Plf could faithfully fulfill a duty of impartiality and confidentiality to the Board. DPD need not assume that risk. Excluding biased individuals is not a violation of the First Amendment or retaliatory; instead, it is a viewpoint-neutral "restriction [that] is reasonable in light of the purpose served by the forum and is 'not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Hawkins*, 170 F.3d at 1287, quoting *Forbes,* 523 U.S. at 677-78 (internal quotations omitted). There is no requirement that the government "wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius* at 810. DPD was reasonable to fear that Plf would disrupt the function of the Board and ultimately wreak havoc upon it, especially if the Board reached a decision she opposed in an investigation. DPD decision not to offer her a position on the Board in light of those unjustifiable risks was reasonable, viewpoint-neutral, not retaliatory, and should be upheld.

**4.** *The Board is ultimately government speech, which DPD is entitled to control.*

Plf's claims also fail because the Board ultimately produces government speech. An individual is not entitled to express contrary views to government speech in a nonpublic forum; indeed, "government speech would be unduly chilled if any individual or group with views contrary to those of the government were entitled to access to non-public governmental fora for rebuttal." *Hawkins*, 170 F.3d at 1289 (internal quotations omitted). The Board's activity and findings are government speech: they are kept strictly confidential and are used for government purposes, not public purposes. (See Ex. A). DPD is not required to permit access to the Board for

12

rebuttal, and it is entitled to control the ultimate content of the Board's reports. *See Wells v. City and County of Denver*, 257 F.3d 1132 (10th Cir. 2001); *see also Knights of the Ku Klux Klan v. Curators of Univ. of Mo.*, 203 F.3d 1085, 1093-94 (8th Cir. 2000), cert. denied, 531 U.S. 814 (2000); *see also Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011 (9th Cir. 2000), cert. denied, 532 U.S. 994 (2001).[8] Allowing Plf unfettered access to the Board would unfairly damage its ability to control its own speech.

For all the foregoing reasons, Plf is unlikely to succeed on the merits of her claims.

### B. Plaintiff Cannot Show that She Will Suffer Irreparable Harm.

Plf has not and cannot show that she will suffer irreparable harm if her preliminary injunction is not granted. To show irreparable harm, "an injury must be certain, great, actual, and not theoretical. Merely serious or substantial harm is not irreparable harm." *Schrier*, 427 F.3d at 1267. Where a constitutional violation is alleged, likelihood of success on the merits is consummate with a demonstration of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019).

Plf simply cannot demonstrate that she would suffer irreparable harm—an injury that is "certain, great, actual, and not theoretical"—if she is not immediately allowed to reapply to the Board or join the Board. *Schrier*, 427 F.3d at 1267. As explained above, her contention that a federal or state constitutional violation occurred is likely to fail on the merits; thus, she cannot

---

[8] In *Wells*, the City of Denver did not need to include the message of any interested private party in its holiday display. In so deciding, the Tenth Circuit relied on *Knights* and *Downs*. In *Knights*, the Eighth Circuit held that a public radio broadcast could refuse to publish the hateful message of a white supremacist group. In *Downs*, the Ninth Circuit permitted a school to restrict messaging on a school bulletin board to prevent a teacher from displaying anti-homosexual messaging. Both entities were engaged primarily in government speech.

rely on the presumption that no further showing of injury is necessary in light of a constitutional violation to demonstrate irreparable harm. *Free the Nipple-Fort Collins*, 916 F.3d at 806. Plf loses nothing of monetary value.[9] The harm Plf seems to suggest is that she cannot "hold officers to account" if she is not a member of the Board, but this argument fails as well. (Complaint, ¶ 16). Plf was and continues to be an "outspoken" and "vocal critic" of DPD; she continues to "consistently serve" her community in "advocating for . . . police reform;" and she continues to make her voice heard loudly in opposition to DPD and its use of force. (Compl., ¶ 13, Decl. of Regan Benson, ¶ 3). Clearly, her ability to continue her First Amendment activities remains robust, even without a position on the Board.

### C. The Balance of Equities and the Public Interest Weigh in Defendants' Favor.

Plf faces a "heightened disfavored-injunction standard" and must make a "strong showing that the balance of harms tips in [her] favor." *Free the Nipple-Fort Collins*, 916 F.3d at 806. On balance, the harm that the Board would incur by being forced to accept Plf as a member greatly outweighs any harm Plf would face. Allowing an individual who likely cannot maintain confidentiality and who has apparently prejudged the outcome of any use-of-force investigation would grievously harm the mission and purpose of the Board. It cannot be overstated: there is no requirement that the government "wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius* at 810. Similarly, the principle that it is "always in the public interest to prevent the violation of a party's constitutional rights" does not apply here, where Plf cannot

---

[9] Plf has not brought a claim for discriminatory failure-to-hire under Title VII of the Civil Rights Act of 1964, nor can she, where she had no entitlement to a purely volunteer position for which she was unqualified based on the reasonable criteria required of a position on the Board. *See Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 982-83 (10th Cir. 2008); *see N.L.R.B. v. Interstate Builders, Inc.*, 351 F.3d 1020, 1035-36 (10th Cir. 2003) (internal quotations omitted).

demonstrate that she will prevail on the merits of her constitutional violation claims. *Free the Nipple-Fort Collins*, 916 F.3d at 807. Instead, the public interest in maintaining the functionality of a board required by state law to investigate serious incidents of the use of force in Denver greatly outweighs any interest Plf has in using membership on the Board to advance her agenda. As explained above, the harm to the Board from allowing disruptive, biased individuals sit on the Board would be great, whereas Plf's ability to vocally protest the functions of the DPD has not been chilled.

## **CONCLUSION**

Where Plaintiff is unlikely to succeed on the merits of her constitutional claims, where she cannot demonstrate irreparable injury as a result, where the balance of harms and equities tips in favor of the Defendants, and where it would not be in the public's interest to grant her injunction, Plaintiff's request for a disfavored preliminary injunction should be denied.

WHEREFORE, Defendants respectfully request that this Court DENY Plaintiff's Motion for a Preliminary Injunction.

DATED this 5th Day of August, 2025.

                                              Respectfully submitted,

                                              *s/Bernard Woessner*
                                              Bernard Woessner
                                              Caitlin L. Gemmill
                                              NATHAN DUMM & MAYER P. C.
                                              7900 E. Union Avenue, Suite 600
                                              Denver, CO 80237-2776
                                              Telephone: (303) 691-3737
                                              Facsimile: (303) 757-5106
                                              ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

   I hereby certify that on this 5th day of August, 2025 I electronically filed the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF** using the CM/ECF system which will send notification of such filing to the following:

Andy McNulty
Mari Newman
Madeline Leibin
1490 N. Lafayette Street
Suite 304
Denver, CO 80218
Phone: (720)850-5770
andy@newman-mcnulty.com
mari@newman-mcnulty.com
madeline@newman-mcnulty.com

                *s/Bernard Woessner*
                Bernard Woessner
                Caitlin L. Gemmill
                Attorney for Defendants
                NATHAN DUMM & MAYER P.C.
                7900 E. Union Avenue, Suite 600
                Denver, CO 80237-2776
                Telephone: (303) 691-3737
                Facsimile: (303) 757-5106
                BWoessner@ndm-law.com
                CGemmill@ndm-law.com